[Civ. No. 13263. Second Dist., Div. One. Apr. 15, 1942.]

HARRY C. MABRY, as Executor, etc., Plaintiff and Respondent, v. ALZOA SCOTT et al., Defendants and Respondents; TITLE INSURANCE AND TRUST COMPANY (a Corporation), Appellant.

O'Melveny & Myers, Louis W. Myers, Pierce Works, W. B. Carman, Jr., and Jackson W. Chance for Appellant.

Harry C. Mabry in pro. per., Newlin & Ashburn, Gurney E. Newlin, Clyde E. Holley, Hudson B. Cox, and Allen W. Ashburn for Plaintiff and Respondent.

William C. Mathes and C. H. Hartke in pro. per., Mathes & Sheppard, Gordon F. Hampton and Freeman R. Brant for Defendants and Respondents.

DRAPEAU, J. pro tem.—March 25, 1931, defendant, Title Insurance and Trust Company, made a declaration of trust, acknowledging delivery to it of real and personal property of a value totaling some $1,350,000, to be held irrevocably in trust, for the use and benefit of named beneficiaries. The income from the trust estate was to be paid, and the corpus finally distributed, in accordance with the terms of the trust agreement. All of the properties placed in trust were owned by William J. Garland, settlor, and were about to be distributed to him from the estate of his deceased father.

Living beneficiaries of the trust were Alzoa Eaton Garland and William J. Garland, then husband and wife, and their four minor children.

The trust was to terminate upon the death of the last survivor of these six people, and then to go (1) to the living issue

of the four children of Mr. and Mrs. Garland (grandchildren, and their descendents *per stirpes*), or, contingently, in the event of their death, to living spouses of these four children; or (2) if there were no living issue of Mr. and Mrs. Garland of any degree, to the heirs of Mr. Garland. Beneficiaries in these two categories must be treated as unborn, unknown, and presently unascertainable, because the four minor children were of tender years, unmarried and had no issue, and Mr. Garland was living. They are all contingent remaindermen. When it is necessary to distinguish between the two classes, issue of the living children will be referred to as unborn contingent remaindermen.

Net income from the trust was to be paid: First—$1,250 per month to Alzoa Eaton Garland. Second—Additional payments to said Alzoa Eaton Garland, or upon her death or at the direction of the settlor to their then living issue, in amounts commencing at $500 per month during the first five years of the trust and increasing each five years thereafter to $1,250 per month during the fourth five years of the trust. Third— All of the remainder of the income, if any, to be paid monthly to settlor.

It would extend this opinion unduly to set out in detail all of the provisions of the trust agreement or all of the contingencies affecting payment of income or distribution of corpus. Such only as appear to be pertinent will be referred to.

July 16, 1931, Mrs. Garland secured in the Superior Court of Los Angeles County an interlocutory decree of divorce from Mr. Garland, which was followed by a final judgment of divorce July 20, 1932. August 17, 1932, Mrs. Garland married Millard L. Scott.

In October, 1933, William J. Garland married Grace O. Hoyt. There is one minor child the issue of that marriage, Jane Mary Garland.

March 7, 1936, Mr. Garland filed a complaint in the superior court, alleging fraud, undue influence, and failure of consideration, and praying that the trust be cancelled and set aside, and that title to the real and personal property involved be quieted in him. The complaint also alleged that shortly prior to the time the trust was made the plaintiff deeded to his then wife his dwelling house in Beverly Hills, and prayed that that transaction likewise be cancelled and set aside. The complaint named as defendants, Alzoa Eaton Scott, the former wife of the plaintiff, the four children, and the trustee.

Other named defendants were dismissed from the case; others were brought in as will later appear.

In support of his allegations of fraud, undue influence and failure of consideration, the plaintiff alleged a confidential relationship between him and Alzoa; that he had had infantile paralysis, and as a result thereof was in continual pain and suffering, so severe that he was afraid it would impair his mental and physical ability to take care of the property which he was about to receive from the estate of his deceased father; that after discussing this situation with his wife, it was agreed it would be advisable to convey all of this property to a trustee, to manage and control it, and to pay the income to Alzoa, who would disburse it for the support and maintenance of the family; that after conveying all of his property to the trust, and deeding his home to her, he left on a trip around the world; that while on this trip, to his consternation and surprise, he was advised she had sued him for divorce; that unknown to him Alzoa was on friendly terms with Mr. Scott when the conveyances were made to her and to the trust; that she concealed from him her relations with Mr. Scott, induced him to divest himself of all of his property, for the benefit of herself firstly, for their children secondly, and for himself lastly, and then, when this was done and he left on his trip around the world, she straightway took up with Mr. Scott and filed her divorce complaint; and that because of his trust and confidence in Alzoa, and her machinations and his conveyances in consequence thereof, he found himself stripped of his income, deprived of his home, and bereft of his family.

In her answer Alzoa denied all of these allegations; she alleged it was only after her husband left her and told her he was through with her and the children that she brought her action for divorce; that she had always been willing and desirous of living with him as his wife, and making a home for him and their children. She particularly and specifically denied any wrongful conduct or association with Mr. Scott. She also alleged that the trust was coincidental with and contemplated in a property settlement agreement between her and her husband. The property settlement agreement bears the same date as the trust agreement. Some of its recitals corroborate certain of the denials and allegations of the answer.

With the issues thus framed, the plaintiff and the defendant Alzoa agreed upon a compromise of the litigation. They

were each to receive from the trust $60,000 cash; the monthly payments from income were to be made on a percentage basis, 25 per cent to the children and the remaining 75 per cent equally to the plaintiff and Alzoa, payable to the latter two persons or their assigns until termination of the trust.

The complaint was amended to allege mistake of fact on the part of the settlor, in that when he conveyed all of his property to the trust, he believed that Alzoa would remain his wife and take care of him and his family out of the monthly payments to be made to her, and in that both he and Alzoa believed in any event there would be sufficient earnings to pay him at least $1,000 a month; that since the creation of the trust, there had not been sufficient income to make any payments to him for his support and maintenance, because the trust had received only enough income to make the payments required to be first made to Alzoa. The amendment further alleged that had the settlor not been acting under mistake of fact, he would have required a provision in the trust agreement for the distribution of income as stated in the compromise. These allegations were denied by answers filed by all of the defendants, including the trustee, all of the living beneficiaries, and all of the contingent remaindermen, appearing either in person or by guardians *ad litem*.

It is evident that neither Mr. nor Mrs. Garland realized or understood the results which would follow a covenant in the trust agreement requiring the trustee to pay out of income a fixed and definite amount of money monthly; first, to Alzoa; then, second, to her or to the children; and then, and only then, anything which might be left to the settlor for his support and maintenance. Like many a testator, who, with specific devise and bequest has unwittingly impoverished the members of his family after his death, the settlor impoverished himself when he conveyed all of his property in trust, and divested himself of the only means of livelihood he had, in return for a promise to pay income which in the nature of things would never be available because of prior payments required to be made to other persons. This could well have been a mistake, warranting the exercise of the powers of a court of equity in relieving the settlor from covenants and conditions in the trust agreement which otherwise would not have been made.

Then, with the exception of the trustee, all of the parties as thus represented, including contingent remaindermen and the presumptive heirs—the settlor's present wife, Grace O. Garland, Ida May Garland, his mother, and his brother,

Grover T. Garland, and his infant daughter by his last marriage, Jane Mary Garland, by her guardian *ad litem*—joined in a petition to the court to consider, authorize, and approve the proposed compromise of the litigation.

Upon the hearing of the petition to compromise, the guardian *ad litem* for the unborn contingent remaindermen, and the guardian *ad litem* for the living children, testified that in their opinion the compromise was fair and equitable, and recommended its approval. Whereupon the court, first, by minute order, and then by formal written judgment, approved the compromise, and ordered the modification of the trust in the particulars named.

By appropriate pleadings, representations to the trial court, and notice of appeal, the trustee, Title Insurance and Trust Company, has raised the principal question involved in this appeal, i. e., by judgment of the court modifying the trust, was property of unborn contingent remaindermen taken without due process of law? It is insisted that the court was without jurisdiction to modify, revise, or in any manner reform the trust because the unborn contingent remaindermen were not before it, either in person or by representation; that their interests were adversely affected in that income and corpus of the trust which eventually would have gone to them were depleted in the following particulars: (a) $120,000 in cash was taken out of corpus; (b) Income in which remaindermen were entitled to share upon the death of ancestors (which in certain contingencies would go to corpus), was depleted; (c) In the event the living children are survived by spouse or issue or both, such persons receive one-fourth of the trust income; whereas, under the judgment, 37½ per cent thereof is taken away.

When the litigation is between them, all beneficiaries of a trust are indispensable parties; without their presence the trial court has no jurisdiction to proceed. (*First National etc. Bank* v. *Superior Court*, 19 Cal. (2d) 409 [121 P. (2d) 729]; *McPherson* v. *Parker*, 30 Cal. 455, 456 [89 Am. Dec. 129]; *O'Connor* v. *Irvine*, 74 Cal. 435 [16 Pac. 236]; *Mitau* v. *Roddan*, 149 Cal. 1 [84 Pac. 145, 6 L. R. A. (N. S.) 275]; *Title Guarantee & Trust Co.* v. *Henry*, 208 Cal. 185 [280 Pac. 959].)

The latest expression of the rule is by Mr. Chief Justice Gibson in the case of *First National etc. Bank* v. *Superior Court, supra*: "The law is settled in this state that, where

one of several beneficiaries seeks to fix his share in a trust fund and where judgment in his favor would inevitably determine the amount available for others similarly situated, such other beneficiaries are indispensable parties. A judgment rendered in their absence and purporting to determine their rights is in excess of the court's jurisdiction. (*Bank of California* v. *Superior Court,* 16 Cal. (2d) 516, 521 [106 P. (2d) 879]; *O'Connor* v. *Irvine,* 74 Cal. 435 [16 Pac. 236].)''

But this rule of indispensable parties has one manifest exception. It is founded on the paramount duty of every court to see that justice be done. It takes effect when there are remaindermen not in being and when it is apparent that it is essential, in the interests of justice, to adjudicate rights of living persons.

This exception has been stated, approved, and applied by our courts in numerous cases in which future estates of unborn or unknown contingent remaindermen in real property and the relationship of such estates to rights of living persons have been under consideration. One of the best statements of it is to be found in section 182, chapter 12, Restatement of the Law, Property, Future Interests: *''Prerequisites for binding effect as against interest limited in favor of an unborn person.* A judicial proceeding has binding effect as against the future interest limited in favor of a person who was unborn at the time of the commencement of such proceeding when the requirements stated in some one of the clauses of this section are satisfied, but not otherwise: (a) Such person was duly represented in such proceeding in accordance with one of the rules stated in sections 183 and 186; (b) Such person was duly represented by a guardian *ad litem* appointed to protect the interests limited in favor of unborn persons; (c) The proceeding, duly followed, was one binding the affected thing itself, thus binding both present and future interests limited therein, without either joinder or representation of the persons in favor of whom such interests were limited; (d) The proceeding, duly followed, was one which by statute binds such future interest without either joinder or representation of the person in favor of whom it was limited.''

The reason behind the exception is a simple one of human relationships, implicit in the principle that human laws, and all other temporal things, are for the living; not for the dead or for those not yet in being, if to hold otherwise would result in injustice to living persons. Because parties are not

in being, and therefore cannot be brought before the tribunal, is not sufficient reason for a court to stand by, helpless and impotent, when rights of living persons, in ordinary common sense, ought to be adjudicated.

Two only of the foregoing clauses of section 182 of the restatement will be used as subdivisions in considering this problem:—Were the unborn contingent remaindermen represented in the litigation? Was the proceeding "duly followed" one binding the affected thing itself?

■ With reference to representation: The trial court was correct in its determination that there was virtual representation of the unborn contingent remaindermen by the living children of Mr. and Mrs. Garland. There were no living members of this class of unborn contingent remaindermen. The only persons next of kin who could represent the unborn contingent remaindermen were Alzoa Eaton Garland Scott or the living children of Mr. and Mrs. Garland. It is not necessary to hold that Alzoa represented the unborn contingent remaindermen, because representation of them by the living children was sufficient. But, in determining that the parties were properly before it, the trial court undoubtedly took into consideration the fact that while Alzoa was to receive $60,000 out of corpus, the possibilities of gain to the corpus from the compromise outweighed the possibilities of loss, so that she too could have represented unborn contingent remaindermen. That this was possible has since developed by the death of the settlor and payments required by the trust agreement to corpus of moneys from insurance on his life.

Representation of unborn remaindermen by ancestors was given careful consideration in the case of *County of Los Angeles* v. *Winans,* 13 Cal. App. 234, at 244 [109 Pac. 640]. In that connection in that case the court said: "The conclusion that the interests in remainder of the defendant grandchildren were and are contingent instead of vested does not preclude the application to them of the principle of virtual representation, if the proceedings in which such representation was exercised were such as to otherwise justify it. The rule as to virtual representation is stated broadly by the Supreme Court of the United States in *Miller* v. *Texas & Pacific R. R. Co.,* 132 U. S. 672 [10 S. Ct. 206, (33 L. Ed. 487)], by recognizing the holding of Lord Redesdale in *Giffard* v. *Hort,* 1 Schoale & L. 386, as follows: 'Where all the parties are brought before the court that can be brought be-

fore it, and the court acts on the property according to the rights that appear, without fraud, its decision must of necessity be final and conclusive. It has been repeatedly determined that if there be tenant for life, remainder to his first son in tail, remainder over, and he is brought before the court *before he has issue*, the contingent remaindermen are barred. Courts of equity have determined on grounds of high expediency that it is sufficient to bring before the court the first tenant in tail in being, and if there be no tenant in tail in being, the first person entitled to the inheritance, and if no such person, then the tenant for life.' So, also, the New York court in *Kent* v. *Church of St. Michael*, 136 N. Y. 10 [32 Am. St. Rep. 693, 32 N. E. 704], uses the following language: 'Where an estate is vested in persons living, subject only to the contingency that persons may be born who will have an interest therein, the living owners of the estate for all purposes of any litigation in reference thereto, and affecting the jurisdiction of the courts to deal with the same, represent the whole estate, and stand, not only for themselves, but also for the persons unborn. This is a rule of convenience, and almost of necessity. The rights of persons unborn are sufficiently cared for if, when the estate shall be sold under a regular and valid judgment, its proceeds take its place and are secured in some way for such persons.' (Citing authorities.)''

It is therefore apparent that in this case the living children of Mr. and Mrs. Garland represented their possible unborn issue, unless there was some hostility of interest as between them. In the Winans case it is said: ''The interest of representatives and represented must, however, be so identical that the motive and inducement to protect and preserve may be assumed to be the same in each.'' That case held that there was hostility of interest which precluded representation because a parent life tenant and a child remainderman had acted adversely to the interests of other child remaindermen who might later be born.

Appellant contends that by the compromise in the present case the living children secured a better participation in income than in the trust as originally drawn. Indeed a close reading of the trust agreement supports a theory of the appellant that the living children were to receive no income from the original trust until the death of their mother, or upon the nomination of their father, and that it is necessary to read the property settlement agreement into the trust to give any in-

come to the children. But, assuming that by the compromise the living children received income not provided by the original trust, we are unable to agree with either minor premise or conclusion of appellant's suggested syllogism: that this caused them to profit at the expense of their unborn issue; and that there was thereby created hostility of interest as between the living children and their unborn issue which prevented virtual representation by the living children of the unborn contingent remaindermen.

The principal argument in support of this proposition is that the interests of living children and their unborn issue became adverse when by the compromise agreement the parents of the living children (a) took $120,000 in cash from the trust estate; (b) contingently, income which otherwise would have gone to corpus could be depleted by the compromise, and (c) contingently, depending upon the death of ancestors leaving them surviving spouses and issue, income which might have gone to spouses or issue was cut down 37½ per cent; that the living children consented to these changes in the trust agreement so that they might get the better participation in income provided by the compromise, and thereby deprived the contingent remaindermen of $120,000 which otherwise would eventually have gone to them, and of contingent income. To thus hold would involve conclusions of collusion and conspiracy which the facts of this case will not sustain. The decisive fact still remains that the remaindermen had no interest in the income; the living children had no interest in the corpus, except in the contingencies above stated. These contingencies are too remote to require a decision that the incentive on the part of the living children to protect and preserve the rights of their issue was destroyed. And computations are in the briefs which indicate that should any of these contingencies come to pass, neither income nor corpus will be depleted to the disadvantage of the remaindermen. Therefore, there was no adverse interest as between the living children and their issue which prevented the living children from representing the unborn contingent remaindermen. Under the doctrine of virtual representation the contingent remaindermen were represented and the court had jurisdiction over them and their interests in the trust.

Was this a proceeding binding the affected thing itself? Under the pleadings, when the issues were joined in fraud,

undue influence, failure of consideration, and mistake, the court had jurisdiction to hear and determine the controverted facts. If an affirmative finding could have been made as to any such facts, supported by competent testimony, the court had power to terminate the trust. Therefore it had the right and it was its duty to adjudicate this case, unless the action of all of the parties except the trustee in presenting the petition to approve the compromise, divested the court of jurisdiction. Obviously, there is here involved all of the aspects of the case, and the terms and conditions of the compromise.

In this connection there has been presented a most persuasive argument. It is that courts should always have in mind the rights of remaindermen not in being; that by affirming the judgment in this case, there may be sanctioned a method whereby trusts may be destroyed at will by combinations of living beneficiaries; that this may be done by pleadings framing issues giving jurisdiction to courts of equity to modify trusts, and then by securing judgments based on compromises giving to living beneficiaries property of unborn remaindermen.

The answer to this argument is equally persuasive. It is that courts may be safely entrusted with the protection of rights of unborn remaindermen. And it is in cases of this sort, in which there is jurisdiction in equity of the controversy, that such rights are protected by the courts themselves. In the present case we can confidently assume that this duty was performed by the trial court.

In actions for rescission, when the jurisdiction of equity attaches, it is the duty of equity to adjust all the differences arising from the cause of action presented and to leave nothing for further litigation. (*Walsh* v. *Majors*, 4 Cal. (2d) 384, 398 [49 P. (2d) 598].)

To aid it in the exercise of its jurisdiction to hear and determine this matter, the court appointed a guardian *ad litem* to represent and protect the interests of the contingent remaindermen. Courts of justice as an incident of their jurisdiction have inherent power to appoint guardians *ad litem*. (*Crawford* v. *Neal*, 56 Cal. 321 (1880); *In re Cahill*, 74 Cal. 52 [15 Pac. 364] (1887); *Carraway* v. *Lassiter*, 139 N. C. 145 [51 S. E. 968, 971] (1905); *Reynolds* v. *Reynolds*, 208 N. C. 578 [182 S. E. 341] (1935).)

A court of equity in its general jurisdiction over trusts has power to do whatever is necessary to preserve a trust from

destruction, including the power to modify and change the terms of the trust. (*Wood* v. *American Nat. Bank,* 125 Cal. App. 248, 261 [14 P. (2d) 110], concurring opinion of Justice Marks; *Security-First Nat. Bank* v. *Easter,* 136 Cal. App. 691, 697 [29 P. (2d) 422]; *Adams* v. *Cook,* 15 Cal. (2d) 352 [101 P. (2d) 484]; *Young* v. *Young,* 255 Mich. 173 [237 N. W. 535, 77 A. L. R. 963]; *In re North Jersey Title Ins. Co.,* 120 N. J. Eq. 148 [184 Atl. 420, 425]; *Cutter* v. *American Trust Co.,* 213 N. C. 686 [197 S. E. 542, 549]; *Gavin* v. *Curtin,* 171 Ill. 640 [49 N. E. 523, 40 L. R. A. 776]; 65 C. J., "Trusts," sec. 549, pp. 683, 684; 26 R. C. L., "Trusts," sec. 133, p. 1282; note, 28 Cal. L. Rev., 785.)

 In this case it was proper for the chancellor to approve the compromise agreement, having in view the preservation of the trust itself. Having once acquired jurisdiction in equity, the court was not ousted thereof because of its approval of the compromise. This is so, even though interests of contingent remaindermen were affected, it being evident that the compromise was fair and equitable and that unless the case was thus disposed of, the plaintiff had presented a bona fide contention, which, if found true, would have required the annulment of the entire trust. (*New York Life Ins. & Trust Co.* v. *Conkling,* 159 App. Div. 337 [144 N. Y. Supp. 638]; *Reynolds* v. *Reynolds, supra; Wolf* v. *Uhlemann,* 325 Ill. 165 [156 N. E. 334]; *Burgess* v. *Nail,* 103 F. (2d) 37; *Bennett's Guardian* v. *Cary's Executor,* 210 Ky. 725 [276 S. W. 818, 820]; *Williams* v. *Williams,* 204 Ill. 44 [68 N. E. 449, 452].)

There has been considerable argument in the briefs, and citation of authority, as to whether the trustee in this case represented the interests of the unborn contingent remaindermen. In view of there being virtual representation and equitable jurisdiction, it is not necessary to go into this question to any particular extent. There is strong authority for the statement that if it were necessary in order that justice might be done to living parties, the interests of contingent remaindermen in this trust estate could be represented by the trustee. Indeed, the trustee has consistently and vigorously and ably presented to the trial court and to this court its opposition to the judgment approving the compromise and modifying the trust. There is no reason for criticism of the trustee in opposing the judgment here under review.

It is stated in 120 A. L. R. at page 886: "In many cases

involving trust estates the trustee, or the trustee together with the holders of other interests, are regarded as sufficiently representing unborn contingent remaindermen.''

Appellant suggests that the compromise was unfair and inequitable. It should be apparent from what has already been said that it is our conclusion that the trial court, having before it all of the facts in the case, properly held the compromise to be fair and equitable.

This leaves one final thing to be considered in this case, which requires a continuance of the narrative of events in the history of the Garland family. Mr. Garland died July 25, 1940. The petition to compromise was filed August 15, 1939. Without the knowledge of any of the other parties to the compromise, and without bringing it to the attention of the court, it appears that September 17, 1937, Mr. Garland assigned to his last wife, Grace O. Garland, and to his minor child by that wife, Jane Mary Garland, his right to receive 37½ per cent of the income from the trust from and after his death. Also by his last will and testament, dated May 11, 1939, the terms of which were unknown to any of the other parties to the compromise or to the court, he disinherited his children by Alzoa and willed to Grace O. Garland and Jane Mary Garland his entire estate, including his interest in the trust. These facts first appeared in a brief filed by the guardian *ad litem* for the living children mentioned in the trust agreement.

The guardian *ad litem* for the living children, and the defendant trustee, have filed separate applications to this court for leave to produce additional evidence, in accordance with rule XXXVIII of the Rules for the Supreme Court and District Courts of Appeal. In these applications the facts just stated are set forth and supported by exhibits and affidavits.

As as general rule, testimony is taken by an appellate court only when it is necessary as a basis for an affirmance or reversal of a judgment with directions to the trial court. (*Tupman* v. *Haberkern*, 208 Cal. 256 [280 Pac. 970].) If these additional facts had been known to the trial court, in view of all of the other facts in the case, it would not have altered the findings as to the fairness and equity and the necessity of the compromise. Inasmuch as the unborn contingent remaindermen were represented by the living children, it is not necessary to consider whether these additional facts would have

rendered it impossible for presumptive heirs to represent contingent remaindermen.

All of the parties and the court were familiar with the recitals in the petition to approve the compromise. It is apparent therefrom that Mr. Garland was not forbidden to assign his interest in the payments under the trust to any one of the classes mentioned, to wit: "children, wife or mother." Among these classes were included his then wife and his youngest child. There can be no question but that everyone concerned knew Mr. Garland had the right to will his property to whomsoever he pleased.

Nothing hereunder is to be understood as approving the concealment by anyone of any essential element which a court should consider when there has been presented to it a petition to approve the compromise of pending litigation. In such cases, it is the duty of everyone concerned to advise the court to the fullest extent of every detail involved in the transaction. We are loath to believe that any of counsel in this case wilfully withheld from the court any information pertinent to a decision on the fairness and equity of the compromise. But, as indicated, if these facts had been fully presented to the trial court, they would not have changed the findings which support the judgment modifying the terms of the trust.

The motions to produce additional testimony are denied; the appeal from the minute order granting the petition to compromise is dismissed; the judgment is affirmed.

York, P. J., and White, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 11, 1942.