# IN THE MATTER OF THE ESTATE OF PHILIP LANGE, DECEASED.

Argued December 12, 1977—Decided March 6, 1978.

468

---

*Mr. Charles Lee Harp, Jr.* argued the cause for appellant Catherine Lennox (*Messrs. Archer, Greiner and Read,* attorneys).

*Mr. Ronald L. Malcarney* argued the cause for respondent Heritage Bank, N. A. (*Messrs. Miller, Myers, Matteo and Rabil,* attorneys).

*Mr. M. Jefferson Davis* argued the cause for respondent Catherine H. Lange (*Messrs. Reiners and Davis,* attorneys).

The opinion of the court was delivered by

PASHMAN, J.    The issue presented by this appeal is the propriety of surcharging executrices for acts beyond the scope of their powers under the will but validated by the effective consent of all parties in interest to those acts. The County Court, Probate Division, held, and the Appellate Division agreed, that any such consensual conduct was ineffective to exonerate the executrices from liability for the consequences of the breach of their fiduciary duties. Finding merit in the contention that such validation by the parties in interest precludes the imposition of a surcharge under the circumstances of this case, we reverse the judgment of the courts below.

Philip Lange died in December 1967, survived by his wife, Catherine Lange, and their adult children, Catherine Lennox, Elizabeth Dixon and George Lange. His will designated Catherine Lange and Catherine Lennox as co-executrices of his estate and co-trustees of a residuary trust created thereunder. Specific cash bequests of equal amounts were made to each of three children. The residue of the estate was placed in the trust, with the net income to be paid to Mrs. Lange during her lifetime and principal to be invaded, if necessary, to assure that her accustomed standard of living would be maintained. Upon her death, the trust was to terminate with the outright payment of the remaining trust balance in equal shares to the testator's three children, if living, or their surviving issue, *per stirpes*. The residuary assets from which the testamentary trust was to be funded consisted predominantly of numerous shares of various stocks and were valued at several hundred thousand dollars.

In early 1969, the attorney for the estate advised the executrices that approximately $60,000 would be needed to pay the estimated federal estate tax liability. Since liquid assets sufficient to meet this obligation were apparently not available, the attorney recommended that certain of the residuary assets of the estate be liquidated in order to obtain the necessary funds. It was then determined that 1500 of the estate's 4500 shares of stock in the Colonial National Bank (hereinafter Colonial) should be sold and the proceeds applied to the payment of the estate tax.[1] Five hundred shares of the Colonial stock were sold in March 1969 at a price considered to be very unfavorable by Mrs. Lange, who thereupon determined to refrain from selling any more of the stock until market conditions improved.[2] The proceeds of the shares

---

[1]This block of Colonial stock was the largest estate asset in terms of both value and total number of shares.

[2]The market value of the stock when originally acquired was approximately $54 per share; the 500 shares were sold at $38 per share.

sold were used for partial payment of the estate taxes. No attempt was made to liquidate other residuary assets, although estate taxes were still owing. Later that month, apparently at the suggestion of Elizabeth Dixon, the executrices negotiated a loan from the Delaware Valley National Bank (hereinafter Delaware Valley) on behalf of the estate for the balance of the tax indebtedness. Mrs. Lennox agreed to the loan transaction on the understanding that it was to be only a temporary measure and would be repaid as soon as possible by the sale of small increments of the Colonial stock. This loan was secured by the pledge of a substantial amount of the estate's shares of Colonial stock as collateral. The attorney for the estate had given his opinion that the executrices would be acting within their powers under the will in procuring this loan. In addition, the lending bank agreed to the loan only after it had examined the will and satisfied itself that the executrices were authorized to so obligate the estate. Neither George Lange nor Elizabeth Dixon, the other parties in interest under the will, made any objection or otherwise questioned the propriety of the loan transaction. The monies obtained from the loan were used to pay the balance of the estate tax due. Interest on the loan was paid out of income from the residuary assets of the estate, including the pledged Colonial stock.

In late summer of 1971 the attorney for the estate recommended to Mrs. Lennox that a portion of the estate's Colonial stock sufficient to pay off the loan be sold. In March 1972 Mrs. Lennox's husband became the attorney for the estate and made a similar recommendation to the executrices, with which Mrs. Lennox agreed. However, Mrs. Lange, her co-executrix and the income beneficiary under the trust, refused to consent to liquidation of any of the estate's Colonial stock. Her resistance resulted from the opposition to the proposal by George Lange and Elizabeth Dixon, the other two legatees and beneficiaries in remainder. They believed that the stock continued to be undervalued and that any such sale would still yield an unfavorable price for the shares. When the at-

torney formally requested the consent of those two benefici-
aries to the retention of the shares as estate assets, both indi-
cated their opposition to any sale of the Colonial stock. Mrs.
Lange thereafter remained adamant in her refusal to consent
to any liquidation of the Colonial stock.[3] In August 1972
the three children, by agreement, received their specific be-
quests in kind by way of shares of the estate's Colonial stock
and executed the appropriate refunding bonds and releases.
All subsequent efforts by Mrs. Lennox and her husband, as
attorney for the estate, to persuade Mrs. Lange, Elizabeth
Dixon and George Lange to liquidate the remaining Colonial
stock held by the estate and to pay off the Delaware Valley
loan proved unsuccessful. In May 1973 an informal account-
ing rendered by the executrices to all interested parties[4] re-
vealed the outstanding Delaware Valley loan, the pledge of
the Colonial stock and the monthly interest payments on the
loan. None of the beneficiaries objected to the continuation
of the loan or the estate's retention of the pledged and non-
pledged Colonial stock.[5] As late as May 1974 Mrs. Lange,
through her counsel, reiterated her continuing refusal to
liquidate any of the Colonial stock for the purpose of satis-
fying the loan even though the value of the stock had steadily
declined since her husband's death. None of the residuary
remaindermen, other than Catherine Lennox, ever objected

[3]It appears that the opposition of Mrs. Lange, George Lange, and
Elizabeth Dixon to liquidation of the estate's Colonial stock applied
to both the pledged and the non-pledged shares. The record does
not indicate whether consideration was given by anyone to liquidating
any of the other residuary assets in order to pay off the Delaware
Valley loan.

[4]George Lange's two sons had succeeded to his remainder inter-
est as his surviving issue upon his death in 1973.

[5]In October 1972 the shares of Colonial stock were converted into
shares of stock of equivalent value in its corporate successor by
merger, Midlantic National Bank South. For purposes of clarity, we
shall continue to refer to the shares as the Colonial stock.

to the continuance of the Delaware Valley loan or the retention of the Colonial stock during the decline in its market value.

As a result of other unrelated disputes among the parties in interest, in September 1974 Mrs. Lennox filed a complaint with the account annexed in the Probate Division of the Camden County Court. She sought, *inter alia,* to have her final and formal accounting approved and distribution of the residuary assets to the testamentary trustees ordered. She also sought an order directing the executrices to liquidate sufficient estate assets to retire the Delaware Valley loan, the outstanding amount of which was some $33,000 at that time. Mrs. Lennox's formal accounting revealed the outstanding status of the loan and the retention of both the pledged and non-pledged Colonial stock as estate assets. Mrs. Lange filed exceptions to this accounting, in which she had not joined as a co-accountant, in October 1974. None of her exceptions was addressed to the Delaware Valley loan transaction. Neither Elizabeth Dixon nor the two sons of George Lange filed any exceptions to the formal accounting.

Prior to filing her exceptions, Mrs. Lange had filed a complaint in the Probate Division seeking to have Delaware Valley restrained from liquidating any of the pledged Colonial stock for purposes of reducing the principal balance on the loan. It also sought to have Catherine Lennox ordered to take the necessary steps to have another estate asset (a certificate of deposit) liquidated and the proceeds applied to the principal on the Delaware Valley loan. Mrs. Lange alleged that the intervention of the court was required because her co-executrix refused to make any estate assets available to reduce the Delaware Valley loan.

Temporary restraints against the bank and an order to show cause against Catherine Lennox were issued by the probate judge. On the October 4, 1974 return date, the probate judge, prompted by Mrs. Lange's action for injunctive relief against her co-executrix, *sua sponte* raised the issue

of the executrices' authority to have negotiated the Delaware Valley loan and temporarily restrained the executrices from paying any interest on the loan until he ruled on that issue. In her subsequently filed answer to Mrs. Lennox's original complaint, Mrs. Lange requested that retirement of the Delaware Valley loan be held in abeyance until the court determined the propriety of the loan. She also asked that the court surcharge the executrices if the loan was found to be illegal. In late November 1974 the probate judge ordered that the pledged Colonial stock be sold and the proceeds applied to pay the Delaware Valley loan in full, with any excess monies resulting from the sale to be paid into the estate. However, by that time the value of the Colonial stock had so dwindled that the liquidation of the collateral was insufficient to satisfy the outstanding balance on the loan.

At the several hearings on the legality of the loan and other disputed matters, Mrs. Lange advanced the contention that she and her co-executrix daughter had acted improperly and in excess of their powers under the will in negotiating the Delaware Valley loan. As the life tenant with the right to the entire income from the corpus and with the power to invade, when necessary, the principal of the testamentary trust, Mrs. Lange would suffer no real harm from any surcharge imposed on her. Mrs. Lennox's position, however, was substantially more vulnerable and she vigorously contested the alleged impropriety of the loan.

In February 1975 the probate judge held, *inter alia,* that the executrices' negotiation of the Delaware Valley loan for the purpose of meeting the tax liability of the estate was an *ultra vires* act, notwithstanding the fact that no interested party had indicated any objection to the estate's obtaining the loan and no party other than Catherine Lennox had ever objected to the continuance of the loan. The basis for this ruling was the judge's finding that the procurement of a loan to pay a tax obligation contravened specific instructions in the will as to how taxes were to be paid. Con-

sequently, he concluded that it was not the testator's intention that his wife and daughter, as executrices, have the power to obtain a loan to pay the taxes imposed on the estate. The judgment specifically surcharged the executrices jointly and severally in the amount of $26,819.19, which the probate judge found to be the loss sustained by the estate as a result of the procurement of the Delaware Valley loan. This amount was calculated as the decrease in the value of the number of Colonial shares whose liquidation would have been necessary to satisfy the balance of the tax indebtedness in March 1969, the approximate date of the Delaware Valley loan, from that date to the November 1974 date when the collateral was sold at the court's direction. Appropriate adjustments were made for the value of dividends and fractional shares received from the Colonial shares.[6] With respect to Catherine Lennox's contention that even if *ultra vires* the loan transaction was consented to originally and ratified thereafter by all interested beneficiaries, the probate judge held that any such conduct by the adult beneficiaries in this case was ineffective to bind their

---

[6]This computation does not reflect any surcharge of the executrices for the decline in value of the remainder of the pledged Colonial stock or of the non-pledged Colonial stock which were retained as estate assets. The executrices were exempted from any liability for such depreciation in value by a will provision authorizing their retention of any estate assets for such length of time as they, in their discretion, deemed appropriate. Hence it is apparent that the probate judge purported to impose a surcharge only for the losses he perceived as having resulted from the improper negotiation of the loan itself, rather than from the retention of the pledged stock as estate assets. In his view, this amount was the decline in value of the number of shares of the Colonial stock which, but for the Delaware Valley loan, would have been liquidated in March 1969 to meet the estate tax obligation. This number of shares was less than the total number of Colonial shares pledged as collateral for the Delaware Valley loan. It does not appear that he considered the possibility that estate assets other than the Colonial stock could have been liquidated in 1969 to pay the estate taxes or in 1974 to satisfy the Delaware Valley loan.

living minor children and any unborn issue who might be the actual takers in remainder under the trust upon the death of Mrs. Lange. From this ruling and another disputed holding below, Catherine Lennox appealed.

In an unreported opinion, the Appellate Division, while reversing and remanding on the other issue, affirmed the probate judge's holding that the Delaware Valley loan was improper. His imposition, calculation and apportionment of the surcharge on the executrices were affirmed substantially for the reasons expressed in his oral opinion. Our grant of Catherine Lennox's petition for certification was limited to the issue of the propriety of the imposition of the surcharge. 73 *N. J.* 56 (1977). Catherine Lange concedes that negotiation of the loan was *ultra vires* and urges affirmance of the probate judge's ruling on that issue. However, she now contests the propriety of the surcharge. The other party to this appeal, the Heritage Bank, substituted corporate trustee of the testamentary trust, defends the actions of the probate judge in their entirety. Without reaching the probate judge's ruling that the negotiation of the Delaware Valley loan by the executrices exceeded their authority under the will, a holding whose correctness for present purposes will be assumed, we disagree with his conclusion that validation by all interested beneficiaries of an otherwise *ultra vires* act by a fiduciary cannot preclude the imposition of a surcharge for that breach of duty.[7]

---

[7]Although we rest our holding herein on the impropriety of imposing a surcharge with respect to a transaction validated by the parties in interest, we note our disagreement with the probate judge's reason for ruling that the loan transaction was *ultra vires. See ante* at 474. The will gave the executrices during their fiduciary tenure the discretionary power to "mortgage" such estate assets as they deemed necessary. We are persuaded that the power to "pledge" those assets is, in this context, subsumed in the power to mortgage granted by the will. We further find the authority to obtain a loan to be necessarily implicit in the power to mortgage estate assets, since the normal reason for so encumbering an asset is to furnish

I

██ ██ The principle that a fiduciary may be relieved from liability for the consequences of an otherwise surchargeable transaction as a result of legally sufficient validation thereof by all parties in interest is firmly rooted in the law. The rationale underlying this principle is that such validation results in a preclusion of the right of the interested parties to subsequently object to the propriety of the transaction.[8] An eminent commentator has stated this general rule in a more comprehensive fashion:

> If a beneficiary, legatee or next of kin of age and under no disability has knowledge of acts constituting a breach of trust which are about to be or have been committed by the fiduciary and consents to or acquiesces in them voluntarily, knowing his legal rights, he will be barred from objecting to the breach of trust.
>
> [6 *N. J. Practice (Clapp, Wills and Administration)*, § 1124 at 741 (3d ed. 1962) (footnoted citations omitted)]

*See Cohen v. First Camden National Bank & Trust Co.*, 51 *N. J.* 11, 19–20 (1967); *Liberty Title & Trust Co. v. Plews*, 6 *N. J.* 28, 41–42 (1950); *Blauvelt v. The Citizens Trust Co.*, 3 *N. J.* 545, 556–557 (1950); *Ross v. Savings, Inv. & Trust Co.*, 120 *N. J. Eq.* 87, 94–95 (Ch. 1936),

---

security for a loan. *See* Bogert, *Trusts & Trustees*, § 752 at 7 (2d ed. 1962). According a narrower meaning to the term would be discordant with the dominant intent of the testator in this case.

[8]We use the term "validation" in this context as a generic reference to the range of consensual conduct effectively constituting authorization in the eyes of law. A non-exhaustive list of acts' constituting such conduct includes acquiescence, affirmance, approval, assent, concurrence, confirmance, consent, participation, permission and ratification. The legal distinctions among these terms are insignificant for present purposes.

We use the term "preclusion" in this context to refer to a bar to the assertion of a legal claim resulting from the applicability of the principles of either waiver or estoppel, both of which are encompassed by the more general term.

aff'd 123 *N. J. Eq.* 288 (E. & A. 1938); *McAllister v. Mc-Allister,* 120 *N. J. Eq.* 407, 413–414 (Ch. 1936), aff'd o.b. 121 *N. J. Eq.* 264 (E. & A. 1937); *In re Leupp,* 108 *N. J. Eq.* 49, 65 (Ch. 1931). *See also Burnett v. First National Bank of Waco,* 536 *S. W.* 2d 600, 602–603 (Tex. Civ. App. 1976); *Zampetti v. Cavanaugh,* 406 *Pa.* 259, 176 *A.* 2d 906, 910 (1962); *Chicago Title & Trust Co. v. Shellaberger,* 399 *Ill.* 320, 77 *N. E.* 2d 675, 689 (1948); Bogert, *Trusts and Trustees* §§ 941, 942 (2d ed. 1962); 3 *Scott on Trusts* §§ 216, 216.2, 218 (3d ed. 1967); *Restatement, Trusts* 2d, §§ 216, 218 (1959); 76 *Am. Jur.* 2d, *Trusts,* §§ 336, 341, 586; 90 *C. J. S., Trusts,* § 254. Such validation does not have the effect of enlarging the powers of the fiduciary; it merely operates to prevent the parties in interest from holding the fiduciary accountable for the consequences of the validated conduct. *See Scott on Trusts, supra,* § 216 at 1733, citing *City Bank Farmers Trust Co. v. Smith,* 263 *N. Y.* 292, 295, 189 *N. E.* 222, 223 (1934).

■ Although the principle is most often encountered in the context of trusts and trustee liability, it applies with equal force to other fiduciaries similarly-situated, such as executors and administrators. *See In re Estate of Simon,* 44 *A. D.* 2d 570, 353 *N. Y. S.* 2d 39, 40 (N. Y. App. Div. 1974) (estate beneficiary's implied ratification of executor's improper sale of estate property barred her from exercising right to have sale set aside); *In re Estate of Poulsen,* 54 *Wis.* 2d 139, 194 *N. W.* 2d 593, 595 (1972) (participation by estate beneficiary in executor's breach of fiduciary duty precludes charging executor with fraud); *In re Shipley's Estate,* 337 *Pa.* 571, 12 *A.* 2d 343 (1940) (acquiescence of legatees precludes surcharge of executor for improper retention of estate assets); 33 *C. J. S., Executors and Administrators* § 249.

■ ■ The requisite validation may either precede or follow the alleged infidelity of the fiduciary and may be expressly manifested or, in an appropriate case, inferred

from the surrounding circumstances.[9] *Ross v. Savings, Inv. & Trust Co., supra,* 123 *N. J. Eq.* at 291; *Blauvelt v. The Citizens Trust Co., supra,* 3 *N. J.* at 557. *See also* Bogert, *supra,* § 942 at 395–400; *Scott on Trusts, supra,* § 218 at 1753–1755; *Restatement, Trusts* 2d, *supra,* § 218, Comment a at 509; 76 *Am. Jur.* 2d, *Trusts,* §§ 336, 339, 340, 341.

Before such validation will be held effective to exonerate a fiduciary, the showing must meet exacting standards. A party in interest will not be precluded from challenging a fiduciary's acts or held to have validated his misdeeds in the absence of full knowledge of all the relevant facts and full appreciation of what was being done.

"In order to bind a *cestui que trust by* acquiescence in a breach of trust by the trustee, it must appear that the *cestui que trust* knew all the facts, and was apprised of his legal rights, and was under no disability to assert them. Such proof must be full and satisfactory. The *cestui que trust* must be shown, in such case to have acted freely, deliberately, and advisedly with the intention of confirming a transaction which he knew, or might or ought, with reasonable or proper diligence, to have known, to be impeachable. His acquiescence amounts to nothing if his right to impeach is concealed from him, or if a free disclosure is not made to him of every circumstance which is material for him to know."

> [*McAllister v. McAllister,* 120 *N. J. Eq.* at 413–414, quoted with approval in *Liberty Title & Trust Co. v. Plews, supra,* 6 *N. J.* at 41–42, and in *Cohen v. First Camden Nat'l Bank & Trust Co., supra,* 51 *N. J.* at 19]

*See also Blauvelt v. The Citizens Trust Co., supra,* 3 *N. J.* at 556; Clapp, *supra,* § 1124 at 741. Other jurisdictions have imposed similarly rigorous requirements:

---

[9] We note that where the validation follows the fiduciary impropriety (which would commonly be known as ratification thereof), the resulting preclusion is more accurately described as a waiver of the validating party's otherwise existing right to object than as an estoppel against his doing so. *See* Bogert, *supra,* § 942 at 397–398; *Clapp, supra,* § 1124 at 741 n. 2.

\* \* \* To establish a ratification by a *cestui que trust*, the fact must not only be clearly proved, but it must be shown that the ratification was made with a full knowledge of all the material particulars and circumstances, and also in a case like the present that the *c stui que trust* was fully apprised of the effect of the acts ratified, and of his or her legal rights in the matter. Confirmation and ratification imply to legal minds, knowledge of a defect in the act to be confirmed, and of the right to reject or ratify it. The *cestui que trust* must therefore not only have been acquainted with the facts, but apprised of the law, how these facts would be dealt with by a court of equity. All that is implied in the act of ratification, when set up in equity by a trustee against his *cestui que trust*, *must be proved, and will not be assumed.* The maxim '*ignorantia legis excusat neminem*,' cannot be invoked in such a case. The *cestui que trust* must be shown to have been apprised of his legal rights.

> [*In re Ryan's Will*, 291 N. Y. 376, 52 N. E. 2d 909, 920 (1943), quoting *Adair v. Brimmer*, 74 N. Y. 539, 553–554 (1878)]

*See Burnett v. First National Bank of Waco, supra*, 536 S. W. 2d at 603 (must be shown that beneficiary "had full knowledge of all the material facts which the trustee knew."); *Zampetti v. Cavanaugh, supra*, 176 A. 2d at 910 (preclusion only if beneficiary had "full knowledge of all relevant facts and of his legal rights, and if his consent was not induced by any improper conduct of the trustee."); *see generally* Bogert, *supra*, § 941 at 389–390 (beneficiary must "be informed as to the facts surrounding the transaction to be approved" and "must be made cognizant of the legal effect of his consent \* \* \*."), § 942 at 401–404, *Scott on Trusts, supra*, § 216.3, § 218 at 1750; *Restatement, Trusts* 2d, *supra*, §§ 216, 218; 76 *Am. Jur.* 2d, *Trusts*, §§ 337–338, 341; 90 *C. J. S. Trusts* § 251.

We reaffirm our adherence to these salutary rules which are so vital to the assurance of fair-dealing by fiduciaries. Applying these rules to the instant case, we conclude that the interested parties possessed an awareness of the facts and circumstances, including the legal consequences, of the Delaware Valley loan sufficient for an effective validation of that assumedly *ultra vires* transaction. *See Cohen v. First Camden National Bank and Trust Co., supra* 51 N. J. at 20.

The probate judge never ruled on the question of the validation of the loan transaction. He instead stated that any such authorization would have been ineffective to exonerate the executrices in any event. However, we find ample evidence of consensual conduct with respect to the negotiation and continuation of the Delaware Valley loan in the totality of circumstances in this case. Elizabeth Dixon originally suggested the idea of procuring a loan (instead of liquidating additional Colonial stock to pay the estate taxes) to her mother and sister and later resisted all suggestions to liquidate estate assets to retire the Delaware Valley loan. George Lange acquiesced in the original loan and pledge of Colonial stock and also opposed the various recommendations that the loan be paid through liquidation of the estate assets. Both Elizabeth Dixon and George Lange (as well as Catherine Lennox) signed "boiler plate" releases purporting to relieve the executrices of any liability with respect to their interests in the estate upon receiving their specific bequests. Neither Elizabeth Dixon nor George Lange's surviving issue, the successors to his remainder interest in the residuary trust, objected to the loan transaction at the time of the informal accounting or filed any exceptions with respect thereto in the formal accounting proceeding below. Both accountings fully disclosed the continued existence of the Delaware Valley loan and the pledge of the Colonial stock to secure it. Mrs. Lange, in her dual capacity as co-executrix and income beneficiary under the residuary trust, participated in the negotiation of the loan to the estate secured by the pledge of collateral and was a co-accountant in the rendering of the informal accounting which revealed the details of the loan transaction. She actively and adamantly resisted all efforts to liquidate shares of Colonial stock to satisfy the loan. Nor did Mrs. Lange object to any aspect of the loan transaction in the exceptions she filed to the formal accounting of Mrs. Lennox. *See R.* 4:87–7. Catherine Lennox, in her dual capacity as co-executrix and beneficiary in remainder, was also involved in obtaining the loan, although her original

consent to its procurement was limited and her later informal objections to its continuation were persistent. However, she never took formal action to expedite its repayment until filing her complaint in September 1974.[10]

The direct participation of Mrs. Lange and Mrs. Lennox in obtaining the Delaware Valley loan is sufficient in and of itself to constitute validation on the part of each, thus barring any subsequent complaint concerning the transaction. The fact that the idea of securing a loan to solve the estate's tax difficulties originated with Elizabeth Dixon is strongly suggestive of her concurrence in the transaction. The resistance of Mrs. Lange, Elizabeth Dixon and George Lange to the liquidation of assets in order to retire the loan is certainly indicative of their consent to the loan's continuation. The execution by Elizabeth Dixon and George Lange of the broadly worded releases is inconsistent with any desire on their part to challenge the propriety of any aspect of the executrices' antecedent conduct. The lack of objection by any interested party at the time of the informal accounting in 1973 is further evidence of their confirmance of the matters revealed therein.

Moreover, we view the failure of any party in interest to file an exception in the proceeding below, where the formal accounting fully and fairly apprised them of all circumstances relevant to the loan transaction from its inception, as being highly probative on the issue of their acquiescence therein. *See Hoyt v. Sprague*, 103 *U. S.* 613, 636–637, 26 *L. Ed.* 585, 594–595 (1881) (beneficiaries' failure to seasonably object to matters sufficiently disclosed in several account-

---

[10] We deem grossly inequitable any possible suggestion that the repeated efforts of Catherine Lennox to have the loan retired can form the basis of a surcharge against her in the face of the unyielding resistance of the other interested parties to that course of action. Assuming her actions in this regard were taken in her capacity as a beneficiary, penalizing her in her fiduciary capacity solely because of her own conduct as a beneficiary would be anomalous and irrational.

ings constituted acquiescence barring subsequent claim against fiduciary); Bogert, *supra,* § 941 at 385; 76 *Am. Jur.* 2d, *Trusts,* § 341 at 556. Despite the recurrence of circumstances inviting their disapproval, none of the interested parties, other than Catherine Lennox, ever took any steps which could be even arguably characterized as a disaffirmance of the loan transaction. We are satisfied that the facts of this case, in their totality, manifest sufficient circumstantial guarantees of the existence of voluntary and knowing consensual conduct by all of the parties in interest to warrant the inference of their effective validation of the Delaware Valley loan transaction in its entirety. *See Blauvelt v. The Citizens Trust Co., supra,* 3 *N. J.* at 557. Accordingly, the adult beneficiaries, including the two sons of George Lange, would *a fortiori* have been precluded from seeking to hold the executrices liable for their *ultra vires* act.

## II

Our finding of validation by the adult remaindermen is dispositive of this case only if the resulting preclusion is binding on their minor children and unborn issue, who also are potential takers in remainder under the residuary trust upon the death of the income beneficiary, Mrs. Lange. The probate judge perceived no authority for holding these potential beneficiaries to be so bound and thus viewed any validation by their predecessors in interest as posing no obstacle to a surcharge of the executrices.

The terms of the testamentary trust established by Philip Lange created a present one-third interest on the part of each of his three children in the trust remainder. Thus, at the time of the trust's creation, the presumptive takers in remainder were Catherine Lennox, Elizabeth Dixon and George Lange. If any of the children predeceased his mother, the life tenant, his respective issue would succeed to his remainder interest *per stirpes*. This in fact occurred in the case of George Lange, whose two sons acquired the status of

presumptive takers of his one-third share of the trust remainder upon his death. The identities of the persons who would be the actual takers in remainder are, of course, unascertainable until the death of the life tenant. Thus, the interests of the original beneficiaries in remainder were contingent on their surviving their mother. The interests of their issue were more remote — for any of them to be the actual takers, they not only must be "in being" at the time of the death of the life tenant, but also must have been predeceased by the ancestor to whose remainder interest they would succeed. When the proceedings below were commenced in September 1974, it appears that the beneficiaries who were the presumptive takers in remainder at that time, Catherine Lennox, Elizabeth Dixon and the two sons of George Lange, were the only potential beneficiaries who were *sui juris*. The remaining members of the three classes of potential beneficiaries included the minor children and any unborn issue of each who might be the actual takers of the respective shares at the time the trust principal is distributed.

We believe that the proper approach to resolution of this issue entails application of the principles of virtual representation by a presumptive taker presently embodied in *R.* 4:26–3(a). Where the identities of the actual takers of a future interest are unascertainable or otherwise difficult to determine with certainty, joinder of the presumptive takers of that interest as of the time of the commencement of the action will, in appropriate circumstances, be sufficient to enable any judgment entered therein to be binding upon all persons, whether in being or not, in the class of potential takers of that interest. While the members of that class may not be individually ascertainable at the time of the action, they are identifiable as a class and their interests as such cognizable. The presumptive takers are persons who would be the actual takers of the future interest if the contingency occurred at the time of the commencement of the proceeding affecting the property in which the future interest

exists. They are permitted to represent the entire class of potential takers, but only in the absence of any demonstrable conflict of interest or other hostility between the presumptive takers and the other members of the class sought to be represented. The assumption underlying the doctrine of virtual representation is the existence of a relationship between the presumptive takers and the class of potential takers sufficiently close to guarantee an identity of interest between the representatives and the class and thus to assure that the representation will be adequate. *See Mabry v. Scott,* 51 *Cal. App.* 2d 245, 124 *P.* 2d 659, 663–664 (Dist. Ct. App. 1942), *cert. den. sub nom. Title Ins. & Trust Co.. v. Mabry,* 317 *U. S.* 670, 63 *S. Ct.* 75, 87 *L. Ed.* 538 (1942) ; 5 *N. J. Practice (Clapp, Wills and Administration),* § 295 and n. 31 at 136 (1977 Supp.) *See also Restatement, Property,* §§ 180–185 (1936). Utilization of virtual representation enables the court to act upon the interests of unascertainable contingent remaindermen to the same effect as if they all had been *sui juris* and parties to the action without any infringement of their right to due process. *See Mullane v. Central Hanover Bank & Trust Co.,* 339 *U. S.* 306, 317–318, 70 *S. Ct.* 652, 94 *L. Ed.* 865, 875 (1950).

Thus, if Catherine Lennox, Elizabeth Dixon and the sons of George Lange[11] could have qualified as the respective virtual representatives of the three classes of potential takers of the trust remainder, their validation of the

---

[11] The death of one of the original presumptive takers, George Lange, and his replacement in that status by his sons in 1973 does not affect our analysis. Had the accounting action below been instituted prior to his death, his conduct, as a presumptive taker at that time, in validating the loan transaction would likely have been effective to bind his sons as successors to his interest. However, since his sons validated the loan transaction in their own right after they became presumptive takers, we need consider only the effect of their action upon the rights of the other members of the class of potential takers of George Lange's original remainder interest.

Delaware Valley loan transaction should have the same preclusive effect on the right of any members of the class to have the executrices surcharged as it does with respect to the right of those presumptive takers who were joined as parties.[12] Each class is comprised of the potential takers of the respective one-third interests in the remainder of the residuary trust originally held by the three children of Philip Lange and includes all potential successors to those interests. The representatives of the three classes are the persons who, as of September 1974, stood in the relation of ancestral predecessors-in-interest to the other members of the respective classes. We are satisfied that in such circumstances there is a sufficient nexus between the representatives and the members of each class of potential takers in remainder to justify a conclusion that the class members are bound by the representatives' validation of the loan transaction. We perceive no hostility between the interests of the presumptive takers and the interests of the other members of the respective classes such as would render virtual representation inequitable and disqualify the presumptive takers from binding those who may be the ultimate remaindermen.[13] Accordingly, we hold

---

[12]Although R. 4:26–3(a) itself is not precisely applicable to the proceedings in this case since we are not concerned with the binding effect of a judgment in an action affecting a future interest, we nevertheless feel that the principles of virtual representation can serve as useful guidelines in determining whether the conduct of a predecessor in interest may in any way disentitle his successor to assert a right whose vindication he would otherwise be able to seek. Our court rule does not purport to specify the only set of circumstances in which virtual representation by a presumptive taker may be given effect. Resort to the doctrine in other appropriate contexts, such as that of the instant case, where it is "essential, in the interests of justice, to adjudicate rights of living persons," Mabry v. Scott, supra, 124 P. 2d at 663, is to be encouraged.

[13]The only reason disclosed in the record for the procurement of the loan was the desire of the family members to avoid the loss to the estate which would have resulted from liquidation of the estate's Colonial stock at its undervalued price. We do not doubt that the

that the members of the three classes of potential takers of the respective shares of the trust remainder were bound by their predecessors-in-interest's validation of the loan transaction and their right to have the executrices surcharged therefor was consequently precluded as well.

In view of our determination that the validation of the loan transaction by the presumptive takers was effective to bind the presently unidentifiable eventual takers in remainder, the surcharge of the executrices imposed by the probate judge on his own motion was improper as a matter of law and requires reversal.

That portion of the judgment filed June 23, 1975 and affirmed by the Appellate Division imposing a surcharge on the executrices is hereby vacated and the matter is remanded to the Camden County Court for the further proceedings

family members were motivated in their original and continuing reluctance to have both the pledged and the non-pledged shares of Colonial stock liquidated by their not unreasonable hope that its depressed market value would rise, with the consequent benefit to the estate from any eventual sale. Unfortunately for all concerned, the market situation worsened instead. However, we are not here called upon to judge the wisdom of this course of action with the benefit of hindsight. Although a substantial diminution of what would eventually be the principal of the residuary trust did occur as a result of the non-liquidation of both the pledged and non-pledged shares of Colonial stock, that issue is analytically distinct from the question of the *bona fides* of the presumptive takers' validation of the procurement of the Delaware Valley loan and the pledge of certain of those shares as collateral. Any loss to the estate resulting from the retention of the non-pledged shares would have been sustained regardless of the existence of the loan and pledge. We discern no possible basis for a conflict of interest between the presumptive takers and the potential takers concerning the procurement of a loan to the estate. Nor do we see such a conflict with respect to the continuation of the loan and the continuation of the pledge of stock, since the apparent purpose of both was an attempt to avoid a severe loss to the estate from untimely liquidation of the stock. There is no suggestion that validation of the transaction was done in anything other than complete good faith and with the hope that it would eventually inure to the benefit of both the life tenant and the ultimate takers in remainder.

488

mandated by the Appellate Division's decision of October 8, 1976.

*For reversal and remandment*—Chief Justice HUGHES and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—6.

*For affirmance*—None.