This is a bill filed by the trustee of the estate of Frederick Hemsley, deceased, in part asking for instructions as to its duty with respect to certain "tax free" securities held by it in its capacity as trustee.
The bill was filed May 15th, 1944, final hearing was held on December 6th, 1944, and final briefs on July 2d 1945. This history of the litigation is not intended as showing any lack of diligence on the part of the litigants under the circumstances of this case but to make record of the fact that there has been no delay on the part of the court.
That which gives rise to the request for instructions by the trustee is the question as to whether it should sell all or part of certain "tax exempt" securities now held by it as a part of the residuary trust in its hands for a "profit" of approximately $212,381.25 over par, and also certain government bonds which are partially tax exempt on which there is a profit of approximately $19,000 over par, or to be more explicit, the picture presented by the allegations of the bill and the proofs at final hearing is:
Wholly tax exempt bonds:
Market value on November 27th, 1944 ....... $1,831,110.00 $1,831,110.00
Par value ................................. 1,611,200.00
Cost ...................................... 1,618,728.75
 _____________ _____________
 Premium over par ..................... $219,910.00
 Profit over cost ..................... $212,381.25
Partially tax exempt bonds:
Market value November 27th, 1944 .......... $200,800.00 $200,800.00
Par value ................................. 179,500.00
Cost ...................................... 181,748.14
 ____________ ____________
 Premium over par ..................... $21,300.00
 Profit over cost ..................... $19,051.86

These securities constitute somewhat over 50% of the original "residuary" trust estate, which aggregated $3,075,000. *Page 53 
The above values were fixed as of November 27th, 1944, but it is conceded that any variances which have or will result is of small importance "because the court is asked to adjudicate upon policy and not upon precision and upon the effect generally upon the life tenants and the remaindermen respectively and not upon the precise dollars which either will gain or lose."
While this court is not called upon to execute the trustee's discretion (Bogert on Trusts 1787 § 559) it would seem that on the facts presented herein the trustee was amply justified in asking for the court's aid. The trustee had advised the life tenants and vested remaindermen of the possibility of the sale of the tax exempts at a price which would augment the corpus of the trust fund and the life tenants and vested remaindermen objected to such a sale. The contingent remaindermen are infants and not in position to voice their wishes. The trustee was in duty bound to consider the interests of these minors and the only avenue for a full and fair determination of the question was the filing of the bill and the appointment of the guardian and counsel to represent the infants, with the resultant decree as to the rights of all parties. This course has not been resisted by the life tenants or remaindermen and the guardian ad litem for the infants has requested the court's determination, and the court having assumed jurisdiction without objection, should be very hesitant of its own motion to deny the trustee the protection a decree will afford on a question which the trustee could not answer in safety.
It is argued by counsel for the life tenants and vested remaindermen that the position of the trustee is that of stakeholder and that it has assumed the attitude of a champion for the sale of the tax exempts. I do not so find. True, it has presented its approach to the solution of the problem and the result of its consideration of that problem, but in so doing has only given to the court the benefit of the picture as it sees it, conceding at the same time that there is another side to that picture which it leaves for the court to determine. This is the proper procedure and it would be improper for the trustee to supinely submit to a decree at the dictation of some of itscestuis. *Page 54 
Testator died March 15th, 1915, leaving a will dated January 12th, 1905, with two codicils dated respectively February 20th, 1911, and February 11th, 1914. Decedent, by his will and codicils, created five separate trusts but the only one we are now considering is that denominated by the parties as the "residuary trust," with assets amounting to $3,075,000 at its inception, which was in the form of cash received by the trustee from the executors of the estate over a period from 1919 to 1928. This residuary trust, as provided by the decedent, gave a life estate of two-thirds of the income to the widow, Mrs. Hemsley, and as to one-third of the income, to decedent's only child, Mrs. Gillmore. On Mrs. Hemsley's death her two-thirds of the income passes to Mrs. Gillmore and on the death of Mrs. Gillmore and Mrs. Hemsley the entire principal of the trust vests in Mrs. Gillmore's children equally, if living, the issue of any deceased child to take per stirpes. These great granchildren of testator are herein referred to as contingent remaindermen. It should be here noted that under the terms of the will the vesting in the children of Mrs. Gillmore is determined by the mother's death, so that if she predeceased Mrs. Hemsley her children's interest becomes absolute even though the question of the quantum of that interest will be later increased by the death of the grandmother, Mrs. Hemsley.
Mrs. Hemsley (eighty-seven years of age) and Mrs. Gillmore (sixty years of age) are living. Mrs. Gillmore has three children, all of whom are of full age.
It thus appears that the parties in interest are first, the life tenants, secondly, the vested remaindermen, they being the living children of Mrs. Gillmore, and thirdly, the issue of the grandchildren, the contingent remaindermen. In other words, the interest of the great grandchildren of decedent is conditioned upon their parent predeceasing Mrs. Gillmore. The great grandchildren are a minor child of testator's grandson, born June 2d 1936; another grandchild has two children, a minor son born July 7th, 1931, and a minor daughter born May 22d 1933; and another grandchild has two children, a minor daughter born February 12th, 1940, and another minor daughter born August 19th, 1942. These five *Page 55 
minor children, the contingent remaindermen of the residuary estate, were represented at the final hearing by guardian adlitem duly appointed by this court, as well as by counsel also so appointed.
The life tenants, Mrs. Hemsley and Mrs. Gillmore, as well as the remaindermen, the adult children of Mrs. Gillmore, protest against the sale of any of the securities in question. Counsel for the infant contingent remaindermen says: "If the reinvestment of the moneys secured from such a sale is limited to the purchase of new United States Government securities then this respondent can offer no objection on behalf of the infant defendants who are contingent remaindermen since the security of the corpus has not been lessened. Neither can this respondent object to the reinvestment of said moneys at a later date in municipal securities provided said municipal bonds are of equal security with those now held. * * * It is the opinion and contention of the guardian ad litem for the aforesaid contingent remaindermen that the court should follow the line of conduct expressed in the above cited case of Bliss v. Bliss, 126 N.J. Eq. 308;8 Atl. Rep. 2d 705.
"`It is the duty of the court to protect the remaindermen as well as the life beneficiary under a trust. Such is also the duty of the trustees. It is not the province of the Court of Chancery to allow trustees to speculate in stocks which might result in a loss to the remaindermen,' and should not by its order lend its aid to the trustee in speculating in stocks which might result in a loss to the contingent remaindermen but should, if such order is entered, instruct the complainant to confine its investments to investments having equal security with those that complainant now holds."
The basis for the position of the life tenants and vested remaindermen is generally that the requested sale of the tax exempt securities would discriminate against and result in great loss of income to them and that it would also eventually depreciate the value of the corpus.
It may be well, before considering the evidence adduced at final hearing, to note the applicable law.
Both sides agree that the rule is correctly set up in section232 of the Restatement of the Law of Trusts, as well as comments following that rule: *Page 56 
"If a trust is created for beneficiaries in succession, the trustee is under a duty to the successive beneficiaries to act with due regard to their respective interests.
"If by the term of a trust the trustee is directed to pay the income to a beneficiary during a designated period and at the expiration of the period to pay the principal to another beneficiary, the trustee is under a duty to the former beneficiary to take care not merely to preserve the trust property but to make it productive so that a reasonable income will be available to him, and he is under a duty to the latter beneficiary to take care to preserve the trust property for him.
"Although the trustee is not under a duty to the beneficiary entitled to the income to endanger the safety of the principal in order to produce a large income, he is under a duty to him not to sacrifice income for the purpose of increasing the value of the principal."
Professor Bogert, in his work on 4 Trusts, § 801, says:
"The trustee who holds for successive beneficiaries owes a duty to them to conduct the trust with equal consideration for the interests of all the beneficiaries. He should not unnecessarily show a preference either for the present cestuis or those who are to take income or capital later. * * * `A trustee has no right to take sides as between the life tenants and remaindermen. If he has an election of taking one of several courses, he must take, if possible, that which will not benefit one at the expense of the other.'"
Professor Pomeroy, vol. 3 (4th ed.), § 1071, says:
"It is the trustee's duty to use diligence in investing the trust property so that it may produce as much income as possible, and also to use care and prudence in investing it in such securities as will render its loss highly impropable, even if not virtually impossible."
And again in section 1072:
"It is the trustee's imperative duty to render the trust property as productive as possible consistent with its security
and with the demands of ordinary business prudence and judgment."
Reference is also made to Restatement of the Law of Trusts651, 652 § 227.
In McCracken v. Gulick, 92 N.J. Eq. 214; 112 Atl. Rep. 317,
Mr. Justice Swayze said:
"The fundamental principle is to carry out the intent of the testator. Clearly, when he has created a trust fund and directed that the income be paid a beneficiary for life, he *Page 57 
intends to secure that income to the life tenant; that is the very object of the fund.
"To withhold all dividends would strengthen the corpus of the estate, but the testator can hardly mean to starve the life tenant for the benefit of remaindermen, whom he often has never seen."
The McCracken Case was followed by Graves v. Graves,115 N.J. Eq. 547; 171 Atl. Rep. 681, and reference is also made toThe National Newark and Essex Banking Co. v. Work, 109 N.J. Eq. 468; 158 Atl. Rep. 109:
"There is another phase of this matter which should be borne in mind — that is the intent of the testator. I have no doubt that he wished his children to enjoy a reasonable income during their lives. His grandchildren, the remaindermen, some of whom were not in existence when the will was drawn, could not have interested him particularly. * * * To hold the entire proceeds of the Meadowbrook income would prevent his children from living in the manner to which they have always been accustomed, and deprive them of the ability to care for their own children, the remaindermen, during their minority; and I believe would defeat the intent of the testator as I gather it from the will. The trustees admit such a construction would be a hardship upon the life tenants.
"My conclusion is that the dividends which were received by the testator through Meadowbrook be considered as income and paid to the life tenants. If it be true that this procedure will deplete the estate, it is unforunate but it is no concern of this court. The testator clearly desired his children to enjoy a proper income and it is no fault of any one if, in the problematical future, this income diminishes or ceases."
If it were possible to gather testator's intent as to the solution of the problem before the court from the context of the will and codicils the result would be a decree in conformity therewith. But the court is not permitted to speculate as to what testator would do were he confronted with these problems. The question of intent must be answered by the language used by testator, but it is obvious that in 1905, 1911 and 1914 testator was not contemplating a situation brought about by conditions all of which arose long after *Page 58 
these years. At the time of his death income taxes had been imposed, it is true, but these taxes financed necessities of the government as they then existed and these necessities had not brought about the high income tax impost of later years. Since the making of the will and codicils and testator's death the depression of the late '20s and early '30s and two World Wars have ensued. All we gather from a reading of the will is that testator's first consideration was for his widow and daughter. He evidently desired them to have an income befitting the manner and style of living to which they were accustomed. To accomplish this he devoted a greater portion of his entire estate, giving them an income amply sufficient. His grandchildren were a secondary consideration. He did not, until 1914, create any separate trust for them. He made them remaindermen after the life estates. But as conditions were at the time of the execution of the will and codicils and at the time of Mr. Hemsley's death, he had a right to believe and evidently did, that he had amply provided for his widow and daughter for their lives and for his grandchildren thereafter, and under certain contingencies, his great grandchildren.
The trustee rightfully says that testator's choice of the life tenants as the main object of his bounty cannot be urged as evidence that he intended "to extend to them an ease and insurance against conditions which he could not have vizualized or contemplated at the time he made his will and codicils."
The question before the court must therefore be decided on its legal aspects and the question is, what is the duty of the trustee of this residuary trust? That duty, as laid down in theRestatement of the Law of Trusts, is "to deal impartially" as between the successive beneficiaries, and to act "with due regard to their respective interests." To accomplish this result where, as in this case, the trustee is directed to pay income for life to one set of beneficiaries and at the end of that period pay over the principal to the remaindermen, "the trustee is under a duty" to the life tenants "to take care not merely to preserve the trust property but to make it productive so that a reasonable income will be available for the life tenants," and it is under a duty to the remaindermen to "take care to *Page 59 
preserve the trust property for them." The trustee "is not under a duty to the life tenants to endanger the safety of the principal in order to produce a larger income," but he is under a duty "not to sacrifice income for the purpose of increasing the value of the principal."
I think it is generally conceded that a sale of the tax exempts and the purchase of 2% Governments, as contemplated by the trustee, would not endanger or in any way jeopardize the value of the trust estate.
Would the plan of sale of tax exempts sacrifice income? It will be demonstrated hereafter that the loss of income to the life tenants would be great and that it would also be detrimental to the interests of the vested remaindermen.
The duty of the trustee, as I see it, is to act with due regard to the respective interests of the successive beneficiaries, to deal impartially as between them. To do this, it seems to me, requires the trustee to view the overall picture as it is presented from all the facts, and not close its eyes to any relevant fact which might result in an excessive burden to the one class in preference to the other. To say the trustee may blind itself to the fact that the income of the life tenants bring them within the high brackets of income tax payments would be unjust. That fact must be taken into consideration with all other facts and with them in view, the question of fairness must be answered. The trustee also has a duty to see that the increase to corpus goes to the contingent remaindermen who may never take, and while the interest of these contingent remaindermen must be zealously guarded, the trustee's duty to the life tenants may not be served by saying — we have nothing to do with the question of income tax and its effect on your interest as life tenants if the sale is made — nor may the trustee say that the income remaining after the payment of tax if the tax exempts are sold is sufficient for your needs. It is the duty of the trustee to return the highest income to the life tenants consistent with the safety of the corpus, and not an income which the trustee may deem to be sufficient for their purposes.
It is said by counsel for the trustee, "if income changes impose new burdens they should be shared proportionately *Page 60 
and not added expense for the one for the alleviation of the others." If the sale is made of the tax exempts the benefit is an increase of corpus for the contingent remaindermen and not for the benefit of the life tenants. The sale would be to the sole detriment of the life tenants and vested remaindermen, with no benefit to them at all, and all benefit to the contingent remaindermen.
The trustee, as well as the life tenants and the guardian adlitem, each produced experts to testify as to their opinion as to the propriety of the sale of the whole or a part of the tax exempts. Each one of these expert witnesses are men of ability, integrity and wide experience and each gave his expert opinion from his own individual standpoint and experience.
The trustee's investment officer on trusts, Mr. Ashbridge, disclosed that it was his opinion that a sale should be had. Mr. Boyd, for the trustee, advocates a sale and reinvestment in 2% government bonds for a period of time and then a sale of the 2% bonds and reinvestment in new municipal tax exempts as opportunity offers. Mr. Boyd did exclude from the sale tax exempts of very short maturity. He said, however, that he was not considering the duty of the trustee toward the life tenants in so far as protection of income was concerned. Mr. Collings, for the guardian ad litem, was of the opinion that it was unwise to sell. He was viewing the matter more from the interest of the life tenants. He said, however, disregarding the life tenants interests and only considering the remainder interest, a sale should be had. The final question to Mr. Collings was: "Now having in mind the life tenants' interest, also having in mind the remainder interest, are you able to form a judgment as to whether the plan is good or not?" Answer: "If you consider both interests then I think I wouldn't sell the bonds." Mr. Brombach for the life tenants and remaindermen, from whose testimony the result of the sale of the interest of the life tenants and remaindermen is taken, thought it unwise to sell. General Gillmore for the life tenants and vested remaindermen likewise thought it unwise to sell.
From the above very sketchy reference to the evidence adduced at final hearing it would seem that the court has *Page 61 
before it the testimony of men of wide experience in the financial world and that there is a divergence in the opinion arrived at by these experts, and that that divergence might be said to leave the weight of the expert testimony in equipoise. I think it may be fairly said, however, that if the client of any one of these experts happened to be an individual seeking advice from the standpoint of an investor of his own funds that the answer would have been a unanimous opinion that the tax exempts should be sold, this depending, of course, on the income bracket of the individual investor who might be seeking advice. I think it may also be said that the testimony of the experts, in some instances at least, displayed a failure to comprehend the trust aspect involved in the question, to the extent that it was necessarily involved for a fair solution as between the divergent interests of the life tenants and remaindermen to those interests of the contingent remaindermen.
Counsel for the life tenants and vested remaindermen have attached to their brief tables to show the result of a sale of all or half of the tax exempts on the life tenants during their joint lives, and also on Mrs. Gillmore in the event she survives her mother, which tables, generally speaking, show, as stated by counsel, "that if the sales are made on the basis as requested in the bill of complaint, and then reinvested on a 2% basis as now suggested, Mrs. Hemsley will sustain a 58% loss in her retained income after payment of income tax; Mrs. Gillmore will sustain a 46% loss, and in the event of Mrs. Hemsley's death, Mrs. Gillmore's loss would soar to 64%. The comparable figures, if only one-half were sold as suggested at the hearing, would be a 28% loss for Mrs. Hemsley; a 22% loss for Mrs. Gillmore and a 31% loss for Mrs. Gillmore following Mrs. Hemsley's death." These figures, according to counsel, were on the basis of data produced at the time of the hearings and are not necessarily the correct percentages as of the date of the filing of briefs. However, it is suggested that the percentages will not very materially change.
Counsel for the defendants concede that as the tax exempts mature, and assuming that it is impossible to replace them *Page 62 
with new and comparable tax exempts, the foregoing percentages will change, but alleges that allowing for maturities at the earliest possible dates on the various tax exempt issues, a sale at the present time would, at the end of five years, result in a loss of approximately $210,000 of tax free income to the life tenants, and at the end of a ten-year period a loss of approximately $366,000 of such tax free income. These are minimum figures, assuming payment at the earliest possible maturity dates of the bonds, and it is alleged that there would be a substantial loss to the three grandchildren, but at a greatly reduced percentage because these grandchildren are in lower tax brackets.
We have before us a picture where if all tax exempts are sold a profit over cost of approximately $231,000, or a premium over par of over approximately $240,000 may be gained, which will be added to the corpus of the trust. Such gain, of course, would be subject to reduction by capital gain tax. This profit would be added to the corpus and be invested so that the annual income yield would be less than if they were not sold. If sold, we have as heretofore set forth, a very substantial shrinkage of the yearly income of the life tenants and a smaller reduction as to the vested remaindermen. From this it is obvious that considering the interest of these two classes of beneficiaries alone, a sale of the tax exempts should not be made. We can readily see that the beneficiaries of the result of the sale will be the contingent remaindermen by the increase of corpus. The result of a sale, in so far as these contingent remaindermen are concerned, considered alone, would be for their best interest. But the proposed plan of sale and repurchase of other securities out of the proceeds of sale will not add to the security of thecorpus as it now exists. These tax exempts are "blue chip" investments and while the contemplated purchase of bonds to replace those sold carries with it the intent to purchase government securities of like character, there may arise a contingency not now foreseen which would render these repurchased bonds less desirable, and the duty of the trustee of the contingent remaindermen does not carry with it a requirment that the corpus be augmented unless that result may be accomplished *Page 63 
in fairness to the interest of the life tenants and vested remaindermen. It is, of course, plainly the duty of the trustee to in nowise speculate with the trust funds.
In view of the facts as the court sees them, as heretofore outlined, the instructions to the trustee will be that it is not its duty to sell all or any part of the securities herein referred to as tax exempts in order that it may capture for thecorpus of the residuary trust the profit now realizable upon said municipal and government bonds.