704 A.2d 49

IN MATTER OF THE TRUST UNDER THE WILL
OF CHARLES J. MAXWELL, DECEASED.

Superior Court of New Jersey
Appellate Division

Argued September 22, 1997—Decided December 24, 1997.

Before Judges SKILLMAN, EICHEN and WERTHEIMER.

*William C. Slattery* argued the cause for appellants Lauren B. Rupp, Gregory M. Holt, David V. Freeman and Donald M. Freeman (*Slattery, McElwee & Jespersen,* attorneys; *Kenneth L. McElwee* on the brief).

*Steven K. Mignogna* argued the cause for respondent Midlantic Bank, N.A. (*Archer & Greiner,* attorneys; *Peter E. Driscoll* and *Mr. Mignogna,* on the brief).

The opinion of the court was delivered by

EICHEN, J.A.D.

This appeal concerns the administration of the Charles J. Maxwell testamentary trust established in 1945 after the death of the testator (the trust).

The primary questions raised by the appeal are (1) whether the contingent remainderpersons under the trust had sufficient notice and adequate representation during two intermediate accountings approved by the court in 1975 and 1983 (the fourth and fifth intermediate accountings [1]) to justify barring them from seeking to reopen the accountings in order to file exceptions against the

---

[1] The fourth intermediate accounting covered the period from May 13, 1968 to April 18, 1975; the fifth intermediate accounting covered the period from April 8, 1975 to April 15, 1982.

trustees, and (2) whether the exceptions filed by the remainder-persons in 1996 to the fourth, fifth, and sixth and final account-ings [2] were legally sufficient to justify allowing them to take discovery of the trustee. The remainderpersons contend that during the twenty-seven year period covered by the three account-ings, the successive trustees breached their duties to properly invest and manage the trust in that they failed to diversify and impartially administer its assets for the benefit of both the life beneficiaries and the ultimate remainderpersons. As a result, they contend that they suffered a substantial loss as reflected in the serious decline in real value of the trust assets.

We hold that the notice and representation of the minor remain-derpersons at the fourth intermediate accounting were inadequate; that the notice of the proceedings on the fifth accounting may have been deficient; and that the allegations in the exceptions filed to all three accountings are legally sufficient. Accordingly, we re-verse and remand the matter to the Chancery Division for further proceedings consistent with this decision.

## I.

Charles J. Maxwell died in 1945. He left the bulk of his estate to a trust created under his will. The trust required payment of income to certain designated life beneficiaries until their deaths, when the trust would terminate and the principal would be distributed to their descendants.[3] Initially, First Camden National Bank and Trust Company (First Camden) and Maxwell's son became the trustees of the trust. In the early 1950's, after the testator's wife and son died, the testator's grandchildren, Virginia Freeman and Katherine Holt, became the life beneficiaries of the trust, and First Camden became the sole trustee.

---

[2] The sixth and final accounting covers the period from April 16, 1982 to May 9, 1995.

[3] If, however, only one life beneficiary died, that beneficiary's descendants would receive a portion of the income from the trust until the death of the other life beneficiary, after which the trust would terminate.

Virginia Freeman died in 1984 leaving her sons David Freeman and Donald Freeman as her only descendants. Upon their mother's death, Donald and David began receiving the income from their half of the trust assets. In 1994, Katherine Holt died leaving as her only descendants her children Lauren Holt Rupp and Gregory Holt. David Freeman, Donald Freeman, Lauren Holt Rupp and Gregory Holt are the remainderpersons under the trust (the remainderpersons) and the exceptants and counterclaimants herein.

On July 7, 1995, Midlantic Bank N.A.[4] (Midlantic), the present trustee under the will, filed a complaint seeking an order approving its sixth and final accounting and directing distribution of the trust assets to the remainderpersons. On August 4, 1995, the court issued an order to show cause why the relief should not be granted. A number of adjournments followed. Nine months later, on April 17, 1996, the remainderpersons filed exceptions to the third, fourth, fifth and sixth and final accountings, as well as an answer and a counterclaim against Midlantic and its predecessor trustees, First Camden and Heritage.[5] They sought to reopen the intermediate accountings on due process grounds, alleging that the trustees failed to provide them with adequate notice and representation in the proceedings to approve the intermediate accountings. They also asserted that the trustees had failed to properly diversify the trust assets and fairly balance the investments between assets that would "achieve[ ] appreciation and gain as well as income." Additionally, the remainderpersons claimed that Midlantic and its predecessor trustees had failed to make a full and complete disclosure of the true value of the trust assets, alleging that they had actively sought to conceal substantial

---

[4] First Camden was acquired by Heritage Bank, N.A. (Heritage) in 1975, and Midlantic acquired Heritage some time prior to 1983.

[5] On appeal, the remainderpersons have abandoned their challenge to the third intermediate accounting.

decreases in their value. Accordingly, in their counterclaim, the remainderpersons sought to recover "an amount sufficient to fully restore the trust estate, and thus the remainderpersons, to the extent and position they would have occupied if the trust were faithfully and properly administered." The remainderpersons also sought recoupment of the commissions, legal fees and costs previously awarded to the trustees, as well as punitive damages.

The remainderpersons traced the history of the performance of the trust beginning with the first intermediate accounting in 1957 and provided graphs to demonstrate the deterioration in its value over the years. The exceptions noted the decline in the value of the trust assets even though there had never been an invasion of the principal of the trust during the entire period covered by the accountings. The remainderpersons compared, for example, the market value of the trust assets in 1968, at the beginning of the period covered by the third intermediate accounting, which was $382,420.36, with its value at the time of the sixth and final accounting in 1995, which was $402,854.81.[6] They fault the lack of diversity in the trust assets, pointing out that almost from its inception, over 85% of the trust was comprised of the same three common stocks, Christianna, DuPont and General Motors, noting that the National Bank Examiners in 1953 had been critical of this concentration of assets.[7] They also contend that during the later accounting periods the trustees over-invested in income-producing assets to their detriment.[8]

---

[6] Although there appears to be an increase in value over the twenty-seven years, the remainderpersons argue that, given inflation, in actuality there has been a substantial decline in the real value or purchasing power of the trust assets. *See Restatement (Third) of Trusts* § 227 comment c (Westlaw 1997); Recent cases, *Restatement Trusts—Investment Duty—Surcharge for Failure to Maintain Purchasing Power of Res,* 13 *Rutgers L.Rev.* 361, 387 (1958).

[7] The record reflects that the trustees only began to diversify the trust assets in 1975.

[8] Although the record contains the fifth intermediate accounting, the sixth and final accounting has not been provided.

On April 8, 1996, Midlantic filed a motion in the Chancery Division, Probate Part seeking to strike the exceptions and the answer and to dismiss the counterclaim. On June 13, 1996, the judge granted Midlantic's motion with respect to the intermediate accountings, ruling primarily that the remainderpersons had received adequate notice of the proceedings to approve the prior accountings as reflected by the notices mailed to their addresses of record. The judge also determined that the minor remainderpersons had been adequately represented at the fourth intermediate accounting by David Freeman as their "virtual representative." *See R.* 4:26–3(a). However, with respect to the sixth and final accounting, the judge permitted the remainderpersons to file amended exceptions to more specifically set forth the bases of their claims against the trustee.

On August 27, 1996, Midlantic moved to strike the amended exceptions, and the remainderpersons filed a cross-motion for reconsideration of the court's earlier order striking their exceptions to the intermediate accountings. By order dated October 31, 1996, the Chancery Division judge denied the remainderpersons' cross-motion for reconsideration. The judge determined that the amended exceptions were insufficient as a matter of law and denied the remainderpersons' request for discovery. On January 2, 1997, the judge entered an order approving the sixth and final accounting and struck the remainderperson's amended exceptions. Thereafter, on January 22, 1997, the judge entered an order awarding commissions and counsel fees to Midlantic with respect to the sixth and final accounting, and for defending against the remainderpersons' claims. This appeal ensued.

These are the essential facts concerning the issues of notice and representation of the remainderpersons in the proceedings for approval of the fourth and fifth accountings. At the time of the testator's death in 1945, the remainderpersons were not yet born. On June 26, 1956, David Freeman was born; his brother Donald Freeman was born on August 20, 1960; Gregory Holt was born on November 3, 1959; and Lauren Holt Rupp was born on

October 3, 1962. In 1957, shortly after David's birth, the record reflects that First Camden wrote to Virginia Freeman requesting information concerning the status of any children, explaining that a guardian "must be appointed to represent the minor's interest." In 1958, a letter written to Virginia Freeman's attorney reiterated the need for a guardian *ad litem* where "a 'possible' conflict between the income beneficiary and the ultimate remainderman [exists]." Similarly, in 1968, prior to the filing of the third intermediate accounting, First Camden again wrote to Virginia Freeman, advising that neither she nor her sister Katherine Holt, the other life beneficiary, could serve as guardian *ad litem* because "no one having any possible conflict of interest with the minors can serve." The trustee further rebuffed the life beneficiaries' efforts to have their mother, who lived in Florida, serve as guardian *ad litem* for the minor remainderpersons. Consequently, during the remainderpersons' minority, at least through the third intermediate accounting, they were represented by guardians *ad litem* in the proceedings brought for approval of the first, second and third intermediate accountings.

The record reflects that the trustees and the life beneficiaries were both keenly aware of the conflict necessitating the appointment of a guardian *ad litem* to represent the minor contingent remainderpersons in the ensuing intermediate accountings. Nonetheless, on August 22, 1975, Heritage filed a complaint seeking approval of the fourth intermediate accounting without seeking the appointment of such guardian *ad litem*; instead, the trustee sought an order pursuant to *R.* 4:26-3(a) designating and appointing David Freeman, who had turned eighteen on June 26, 1974, to represent the three minor remainderpersons. At the time, David Freeman was a dependent residing in Georgia with his mother, Virginia Freeman, one of the life beneficiaries. The complaint described David as an adult, without indicating that he had just attained maturity.

Paragraph 5 of the complaint states as follows:

> There are contingent gifts ... under Article Seventh, paragraphs (I) and (J) [of the will], to the grandchildren of [the] testator. Included in this group are persons presently alive as well as unborn persons. All such persons included in this group may now be represented under *Rule* 4:26-3 by David Vernon Freeman and there is no possibility of a conflict of interest insofar as the facts in this accounting proceeding are involved between him and the others in such group presently born and unborn.

An affidavit filed on September 11, 1975 states that notice of the fourth intermediate accounting and the appointment of David Freeman as "virtual representative" was mailed on September 8, 1975 to the minor remainderpersons, individually, and to the life beneficiaries, Virginia Freeman and Katherine Holt, at their family homes. At the time of the mailings, David's fourteen-year-old brother Donald lived in the same household in Georgia with David and their mother, Virginia Freeman. Their minor cousins, Lauren Holt Rupp and Gregory Holt, whom David was also representing, lived in Colorado with their mother, Katherine Holt, the other life beneficiary.

According to a certification filed by David Freeman, he contends that "[he] was never notified of the fourth interim accounting in 1975," and that he was never notified that "[he] was either nominated or appointed as the 'virtual representative' for the other [r]emainderpersons, Lauren B. Rupp, Gregory M. Holt and Donald M. Freeman." The latter remainderpersons also disclaim any knowledge of the fourth intermediate accounting. Midlantic did not file an affidavit or certification disputing these claims.

The remainderpersons contended in the Chancery Division that the life beneficiaries purposely withheld knowledge of the existence of the trust from them. In support of their claim of lack of notice, the remainderpersons relied on certain correspondence sent by the life beneficiaries in 1982 to Heritage, prior to the fifth intermediate accounting. The record reflects that on September 1, 1982, Virginia Freeman wrote to the trustee, rebuking it for sending waivers for her sons to sign with respect to the fifth intermediate accounting. She wrote:

> First of all my sons and sister's (Mrs. Katherine Holt) children are not receiving any money from you, so why should they sign something they know nothing about?

My understanding is that they will receive all the money divided at the death of my sister and myself and until then should not be involved in our transaction?

Similarly, in August 1982, Katherine Holt wrote to the trustee: "I would very much like to know why my 2 children and my nephews were sent waivers when the estate of my grandfather was left to my sister VMF and myself." [9]

On February 1, 1983, Heritage filed a complaint in the Probate Part seeking approval of its fifth intermediate accounting. The judge permitted notice of the trustee's intention to seek approval of the fifth intermediate accounting to be sent by certified mail, return receipt requested, to the remainderpersons and life beneficiaries. The order does not indicate the addresses to which the notices were sent. An affidavit of mailing discloses, however, that notice of the fifth intermediate accounting was mailed on March 9, 1983 to the life beneficiaries and the remainderpersons individually, addressed to them at the homes of the life beneficiaries. The record also reflects that the life beneficiaries or their spouses signed the return receipts for themselves and the remainderpersons except for David Freeman, who personally signed a return receipt for the mailing.

At the time of the fifth intermediate accounting, all of the remainderpersons were adults. In seeking to reopen the accounting, all except David claimed that they had never received the mailings relating to the fifth intermediate accounting since they no longer lived with their mothers, the life beneficiaries. Indeed, Lauren Holt Rupp and Gregory Holt contended that they knew nothing of the trust until 1993 when, during their mother's terminal illness, their father told them of it. They argued that the trustee should have realized that the life beneficiaries' signatures on the return receipts were not sufficient to indicate that they had actually received notice of its intention to seek approval of the

---

[9] The life beneficiaries agreed to waive their right to income accountings during these intermediate accounting proceedings; therefore, no income accountings were filed. The documents referred to in the correspondence appear to relate to these waivers.

accounting in light of the passage of time and the life beneficiaries' alleged past resistance to disclosing to their children even the existence of the trust.

Consequently, Gregory, Lauren and Donald maintained that they were deprived of due process of law because they had no notice of the proceedings and no representative to review the accountings or evaluate the management of the trust assets on their behalf during the period covered by the fourth and fifth intermediate accountings. As for David, as earlier noted, he denied knowledge of the fourth intermediate accounting but acknowledged receiving the notice relating to the fifth intermediate accounting.

On the merits, the remainderpersons argued that they had presented a *prima facie* case of a conflict of interest between the life beneficiaries and themselves and had sufficiently pleaded the trustees' breaches of duty under "the prudent investor rule." In support of their argument, they noted that in 1953, even "the National Bank Examiners [had] criticized the fact that a large proportion of the ... trust consist[ed] of [only three stocks]: Christianna Securities common, DuPont common and General Motors common, and ... that these represented an over-concentration." The remainderpersons further observed that correspondence dating from 1957 shows that Virginia Freeman was opposed to diversification of the assets and that apparently, Midlantic's predecessor, First Camden, had agreed not to sell the securities, at least for the time being. They point out, however, that not until shortly after the fourth intermediate accounting in 1975, twenty years after the admonition by the National Bank Examiners, did Heritage and then Midlantic even begin to diversify the trust investments.

They also indicated that by 1995, the trust contained a substantial amount of income-producing assets. Hence, the remainderpersons alleged that in addition to the lack of diversity, there was an imbalance in the investment portfolio between income-producing assets, which benefitted the life beneficiaries, and assets with

growth potential, which would have benefitted them as the ultimate remainderpersons. The remainderpersons claim that this imbalance reflects a clear breach of duty of the successive trustees to impartially make and implement investment decisions beneficial to the remainderpersons and the life beneficiaries alike.

In granting relief to Midlantic, the Chancery Division judge stated the following on the issue of notice:

> It is suggested that, well, the bank should have gone out and gotten a guardian appointed or something because of these comments by the parents [letters from Virginia and Katherine]. And, since they didn't, the minors, when they reached their majority, have a right to come into court and challenge, I think, five separate accountings over the period of 20–some years due to the alleged lack of service of process.
>
> The Court strenuously objects to the thesis. I see no duty upon the bank to do more than that which they did and that is to inform the parents. The parents have their own minds made up about whatever they want. And, because there are idiosyncracies of various custodial parents and so forth and so on, does that create a duty upon the bank, especially under the facts of the case? Let's keep it that way because all of us can create a set of circumstances that may give rise to a duty.
>
> I don't think the set of circumstances that have been presented to the Court give rise to that duty. Also, it is clear to the Court that the Remainderpersons or the virtual representative receive[d] notice, actual notice as defined by our law then existing and now existing.

On the merits of the claims, the Chancery Division judge rejected the remainderpersons' request for discovery, stating:

> Yes, by comparison of values from one date to another, we can see increases and decreases. Well, that phenomenon is a daily phenomenon in the market, or should I say hourly. And how can that be a predicate for opening up a judgment of almost 10 years, 20 years and 30 years of vintage. I don't know.

He reasoned that:

> [T]he law is relatively clear, since we sort of proceed in a summary fashion, . . . I said, be specific. Because the only thing that happens is that the Court would have to make a decision with respect to the question about discovery.
>
> Sure there is discovery. But, basically, we proceed in a summary fashion. But, if there is something there that would warrant the full-blown discovery with respect to some specific item on the report, there's no Court that is going to foreclose that. And, that's all I asked for; give me something with respect to whatever. But, a conclusory assertion that the trustee just exercised poor judgment with respect to the trust, well, that means anybody can walk in here and tie up a trust for 15 years with conclusions under the guise of, well, I need discovery, so I can say anything I want.

But, if there was something about the facts that were spread upon the record in the accounting and all of its backup data and you had the other four or five accountings and all you do is just use everything you have and you can support a request, that was not given in response to the Court's offer. So, the motion is granted, counsel. All right. Thank you all.

On appeal, the remainderpersons contend that the judge failed to perceive the conflict of interest between the life beneficiaries and the remainderpersons, and as a result he did not appreciate the duty owed to them by the trustees to diversity and fairly balance the trust assets. They argue that he also failed to perceive both the procedural and substantive issues raised by the remainderpersons' challenge to the sufficiency of the notice of the fourth and fifth intermediate accountings and the adequacy of the representation of the minors in the proceeding to approve the fourth intermediate accounting. Hence, the remainderpersons contend that the court erred in rejecting their exceptions and counterclaim as insufficient as a matter of law and urge us to reverse and remand so that they may have an opportunity to conduct discovery to demonstrate that the trustees violated their fiduciary duties.

## II.

We first consider the contention advanced by the remainderpersons that the order approving the fourth intermediate accounting in 1975 does not bar them from asserting their claims against the trustees because they did not have "due notice" of the proceedings and were not adequately represented by David Freeman, who was appointed as their "virtual representative" on August 28, 1975.

A judgment allowing an account "after due notice [is] *res adjudicata*" as to all parties and "as to all exceptions which could or might have been taken to the account." *N.J.S.A.* 3B:17–8. Such judgment acts to "exonerate and discharge the fiduciary from all claims of all interested parties and of those in privity with or represented by interested parties except ... [a]s relief may be had from a judgment in any civil action." *Ibid.; see R.* 4:50–1, –2. This concept of finality applies to judgments approving intermedi-

ate accountings as well as final accountings. *In re Estate of Yablick*, 218 *N.J.Super.* 91, 100, 526 *A.*2d 1134 (App.Div.1987).

Actions to settle an accounting by a testamentary trustee are governed by *R.* 4:87–1 to –9 and *R.* 4:88–1 to –3. With respect to notice of a proceeding for approval of accountings involving minors, *R.* 4:87–4(a) provides that

> [i]f any person is a minor or incompetent and except as otherwise provided by *R.* 4:26–3 (virtual representation), service [of process] shall be made on the person or persons upon whom a summons would have to be served pursuant to *R.* 4:4–4(a)(2) and (3) unless a guardian *ad litem* is required under *R.* 4:26–2.[10]

*Rule* 4:26–3 sets forth the procedure for appointing a virtual representative, and *R.* 4:26–2 involves the appointment of a guardian *ad litem* for minors and incompetent persons to act in such proceedings. Inasmuch as David Freeman was appointed under *R.* 4:26–3(a), we first consider whether that rule was properly employed in this case.

 *Rule* 4:26–3(a) allows a person who is a presumptive taker [11] of estate property to represent the entire class of potential takers in an accounting proceeding so long as the class of potential takers has the same future interest as the presumptive taker and no demonstrable conflict of interest exists between them. *In re Estate of Lange, supra,* 75 *N.J.* at 485, 383 *A.*2d 1130. The assumption underlying this rule "is the existence of a relationship between the presumptive taker[ ] and the class of potential takers [that is] sufficiently close to guarantee an identity of interest between the representative[ ] and the class and thus to assure that the representation will be adequate." *Ibid.*

 For the most part, *R.* 4:26–3(a) is utilized to permit a predecessor in interest to represent a successor to that interest.

---

[10] The court rule was substantially the same in 1975 and 1983.

[11] "[A] presumptive taker[ ] [is a] person who would be the actual taker[ ] of the future interest if the contingency occurred at the time of the commencement of the proceeding affecting the property in which the future interest exists." *In re Estate of Lange,* 75 *N.J.* 464, 484–85, 383 *A.*2d 1130 (1978).

Stated another way, the "virtual representation" rule ordinarily applies vertically, not horizontally. *See* Pressler, *Current N.J. Court Rules*, comment on *R.* 4:26–3 (1997). Although the rule frequently involves issues relating to representation of unascertainable successors in interest, "[r]esort to the doctrine in other appropriate contexts ... where it is essential, in the interests of justice, to adjudicate rights of living persons is encouraged." *In re Estate of Lange, supra*, 75 *N.J.* at 486 n. 12, 383 *A.*2d 1130 (citation omitted).

We have carefully considered the virtual representation rule, its rationale and purposes, and are satisfied that neither the express provisions of the rule nor the "in the interest of justice" catchall in *Lange* applies here. Accordingly, the Probate Division judge in 1975 erred when he relied on *R.* 4:26–3(a) to appoint David Freeman as the "virtual representative" of the minor remainderpersons. As a result, the Chancery Division judge's reliance on the finality of the probate order appointing David to "virtually represent" the other minor remainderpersons was misplaced.

Each of the remainderpersons were themselves presumptive takers, and, as such, each was entitled to have been joined as virtual representative of his or her own living or unborn issue. (They, of course, had no living issue.) *See In re Estate of Lange, supra*, 75 *N.J.* at 486, 383 *A.*2d 1130 (recognizing that each of the three presumptive takers in that case represented his or her own class, and when all three acted as the virtual representative of his or her respective class, all successors to those interests were bound). Even though the minor remainderpersons had the same potential one-quarter percentage interest in the trust assets as David, we do not view their relationship as "sufficiently close to guarantee an identity of interest." *See id.* at 485, 383 A.2d 1130. Given the distance between the family households, the difference in parentage between the potential takers, and the fact that David, although of mature age, was not living independently of his mother, the life beneficiary, therefore raising the possibility that

she may have influenced him to approve the accounting, "a possible basis for a conflict of interest" existed between David and his cousins, Gregory and Lauren. *See id.* at 487 n. 13, 383 A.2d 1130. Accordingly, the trustee should not have requested that the court appoint David as their representative. Moreover, it is uncontradicted that David did not actually represent the minor remainderpersons in the proceedings inasmuch as he claims he had no knowledge of the appointment. Consequently, we conclude David's "virtual representation" of the minor remainderpersons on the fourth intermediate accounting was ineffective to bind the minor remainderpersons.

Nor could Virginia Freeman or Katherine Holt represent the minor children's [12] interests in the proceedings, despite their receipt on behalf of the children of notice of the proceedings to approve the accounting.[13] This is because a clear conflict of interest existed between them as the life beneficiaries and their children as the ultimate remainderpersons. *See Bliss v. Bliss,* 126 *N.J.Eq.* 308, 310, 8 *A.2d* 705 (Ch.1939) (discussing conflict between life beneficiary's interest and remainderpersons' interests), *aff'd o.b.,* 127 *N.J. Eq.* 20, 11 *A.2d* 13 (E. & A.1940); *see also In re Estate of Cooper,* 81 *Wash.App.* 79, 913 *P.*2d 393 (determining that trustee breached duty by maintaining investment policy that maximized income to detriment of trust corpus growth), *review denied,* 130 *Wash.*2d 1011, 928 *P.*2d 414 (1996); *Restatement (Third) of Trusts* § 232 (Westlaw 1997) (discussing trustee's duty to succes-

---

[12] At the time the fourth intermediate accounting was approved, Donald Freeman and his cousins, Lauren Holt Rupp and Gregory Holt, were all minors. Donald was fifteen, living with David and their mother, one of the life beneficiaries, while Lauren, age thirteen, and Gregory, age sixteen, were living in Colorado with their mother, the other life beneficiary.

[13] The trustee had sent notices by mail of its intention to seek approval of the fourth intermediate accounting addressed to (1) David Freeman individually and as representative of the other remainderpersons; (2) to the remainderpersons each individually; and (3) to their mothers, the life beneficiaries. Absent any conflict of interest, such notices could have sufficed and the mothers might have represented their children in the proceeding.

sive beneficiaries to assure fair balance between increasing the value of the corpus of the trust and increasing the income generated by the trust); 7 *New Jersey Practice, Wills and Administration* § 994.5 (Alfred C. Clapp & Dorothy G. Black) (rev.3d ed.1984) (same principle). As life beneficiaries entitled only to the income earned by the trust assets, it reasonably could be inferred that the primary interest of Virginia Freeman and Katherine Holt was to maximize that income, rather than to preserve the trust corpus for their children. Midlantic's predecessor trustees understood this conflict as reflected by their insistence, at least in the first three intermediate accountings, that the minor children be represented by an independent guardian *ad litem.*

*Rule* 4:26–2(a) specifically provides that a guardian *ad litem* should be appointed to represent minor beneficiaries where "a conflict of interest exists between guardian and ward." The rule states:

Representation by Guardian. Except as otherwise provided by law or *R.* 4:26–3 (virtual representation), *a minor* or incompetent person *shall be represented in an action by the guardian of* either *the person* or the property, appointed in this State, *or if* no such guardian has been appointed or *a conflict of interest exists between the guardian and ward* or for other good cause, *by a guardian ad litem appointed by the court* in accordance with paragraph (b) of this rule. (emphasis added)

[8–10] In view of the obvious conflict between the life beneficiaries and the minor remainderpersons in this case, the trustee had a duty to assure that an independent guardian *ad litem* was appointed. Accordingly, to the extent that the minor remainderpersons were not adequately represented during the proceedings to approve the fourth intermediate accounting, Donald Freeman, Gregory Holt and Lauren Holt Rupp cannot be bound by the order approving that accounting. Therefore, the Chancery Division judge should not have dismissed their exceptions to the fourth intermediate accounting on that basis, and we are constrained to reverse that aspect of the court's June 13, 1996 order and direct that the minor remainderpersons' pleadings with regard to the fourth intermediate accounting be reinstated. We also direct the judge to reinstate the exceptions as to David Freeman as well, despite the fact that he was not a minor in 1975, in light of his

claim of lack of knowledge of the proceeding to approve the fourth intermediate accounting. However, Midlantic may avail itself of the opportunity to conduct discovery concerning this claim, even though the trustee did not present contradictory evidence in opposition to the remainderpersons' exceptions. In view of the summary nature of the proceedings before the Chancery Division, and our decision to remand the entire matter, it is only fair that both sides have an opportunity for discovery.

### III.

As for the fifth intermediate accounting, Midlantic contends that the judge correctly determined that the trustee's notice by mail was adequate because it was reasonably calculated to apprise all of the remainderpersons of the trustee's intention to seek approval of the accounting. The record reflects that David Freeman, by then twenty-six years of age, received such notice; [14] indeed, he acknowledges receiving notice of the proceeding in his certification. Therefore, David could have filed exceptions to the accounting in 1983. Since he failed to make a timely objection to the accounting, David may not now challenge the trustee's handling of the trust for the period covered by the fifth intermediate accounting. We therefore hold that David is bound by the probate order approving that accounting.

As for the other remainderpersons, none of them signed return receipts for the mailing of the notice and, in fact, each denies any knowledge of the proceeding to approve the fifth intermediate accounting. They contend that the trustee should have inquired further whether they had actually received notice in light of the absence of their signatures on the return receipts, and especially because the trustee had knowledge, based on its own records, of the prior resistance of the life beneficiaries to disclosure of the trust.

---

[14] The return receipt bears his signature.

In their certifications, Lauren and Gregory claim they did not learn of the trust itself until 1993 when their mother was terminally ill. Midlantic did not file a certification contradicting this assertion. The 1982 correspondence from the life beneficiaries to Heritage demanding that it stop sending notices to their children lends some credence to their claim. If they had no knowledge of the trust and were unaware of the proceeding for approval of the accounting, then they should not be barred from seeking to reopen the accounting. However, as previously noted, in view of the scant certifications Lauren and Gregory presented to the Chancery Division judge and the summary manner in which the issue was developed, the trustee may pursue discovery on the issue if it chooses to do so.

We also note the paucity of competent evidence to explain Lauren and Gregory's significant delay in seeking to reopen the accountings after they allegedly learned of their inheritance in 1993, as well as their nine-month delay in filing responsive papers to Midlantic's order to show cause seeking approval of the sixth and final accounting. On this point, however, the record reflects that they may have been attempting to obtain information concerning the trust from the trustee during this period. Since we are unable to determine on this record whether these delays were reasonably justified, we refer this issue, as well as the issue of Lauren and Gregory's prior knowledge of the trust, to the Chancery Division judge for resolution following completion of discovery by the trustee.

A different set of factors are at play with respect to whether the order approving the fifth intermediate accounting should bind Donald Freeman. As earlier noted, Donald's mother Virginia died in 1984. Shortly thereafter, it appears both he and David, who were by then twenty-three and twenty-six years old, respectively, began to receive the income from the trust as successors to their mother's life interest. We assume, therefore, that in 1984 both Donald and David could have requested the trustee to furnish them with copies of the prior accountings. Assuming such capa-

bility, then their delay in challenging the fourth and fifth intermediate accountings until 1996 could be viewed as acquiescence in the disposition and handling of the trust during the periods covered by those accountings. *See Liberty Title & Trust Co. v. Plews*, 6 *N.J.* 28, 41, 77 *A.*2d 219 (1950). We do not decide the issue of whether they are deemed to have acquiesced in the propriety of the accountings. We leave the matter to the Chancery Division judge to determine whether David should be estopped from challenging the fourth intermediate accounting and whether Donald should be estopped from challenging both prior accountings based on their apparent inaction. Here again, to the extent that discovery is necessary to develop a record on these issues, the trustee is at liberty to pursue such discovery.

## IV.

The remainderpersons also contend that the court erred in dismissing their exceptions to the sixth and final accounting which spanned the period from April 16, 1982 to May 9, 1995. They argue that their amended exceptions, along with their brief, exhibits, answer and counterclaim, are legally sufficient pleadings to entitle them to at least conduct discovery because they set forth a *prima facie* case of a breach of fiduciary duties by Midlantic and the predecessor trustee during this period as well.

As earlier noted, *R.* 4:87–1 to –9 governs "actions for the settlement of accounts." *Rule* 4:87–8 provides:

> In all actions for the settlement of accounts, other than plenary actions, any interested person may, at least 5 days before the return of the order to show cause or within such time as the court allows, serve the accountant with written exceptions, signed by that person or his or her attorney, to any item in or omission from the account, including any exceptions to the commissions or attorney's fees requested. The exceptions shall state particularly the item or omission excepted to, the modification sought in the account and the reasons for the modification. *An exception may be stricken because of its insufficiency in law.* (emphasis added).

The Chancery Division judge struck the remainderpersons' amended exceptions to the sixth and final accounting because the judge determined that they lacked sufficient particularity and were insufficient as a matter of law. We disagree and reverse the

January 2, 1996 order striking the exceptions to the sixth and final accounting. We also direct the Chancery Division judge to reinstate the counterclaim dismissed in its June 13, 1996 order.

■ "A fiduciary administering a New Jersey trust is governed by the standard set forth in the New Jersey prudent investment law." *Robertson v. Central Jersey Bank & Trust Co.,* 47 *F.*3d 1268, 1273 (3rd Cir.1995) (citing *N.J.S.A.* 3B:20–12 to –17 (the Act) and applying New Jersey law).

■ *N.J.S.A.* 3B:20–13,[15] entitled "Standard of Care Required of Fiduciary," provides:

> In investing and reinvesting money and property of a trust and in acquiring, retaining, selling, exchanging and managing investments, a fiduciary shall exercise the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. In making each investment, a fiduciary may, depending on the nature and objectives of the portfolio, consider the whole portfolio, provided that, in making each investment, a fiduciary shall act with the reasonable expectation that the return on each investment shall be commensurate with the risk associated with each investment. If the fiduciary has special skills or is named as the fiduciary on the basis of representations of special skills or expertise, he is under a duty to exercise those skills. The fiduciary shall be under a duty to manage and invest the portfolio solely in the interests of the trust beneficiaries and for the exclusive purpose of providing financial benefits to trust participants.

The exercise of such "care, skill, prudence and diligence" under the Act requires a fiduciary to diversify investments "so as to minimize the risk of large losses." Therefore a prudent fiduciary "should not invest a disproportionately large part of [a] trust estate in a particular security or type of security." *Commercial Trust Co. v. Barnard,* 27 *N.J.* 332, 343, 142 *A.*2d 865 (1958).

■ Additionally, a trustee representing beneficiaries in succession is under a duty to the successive beneficiaries to act with due regard to their respective interests and to preserve the trust

---

[15] We recite the most recent version of this section of the Act. Although the Act has been amended numerous times during the long period covered by the accountings, the duty of a fiduciary administering trust assets to invest prudently has not been changed in any material respect by these amendments so as to alter our determinations herein.

property for the remainderpersons, and not just make it productive of a reasonable income for the benefit of the life beneficiaries. *See Pennsylvania Co. v. Gillmore,* 137 *N.J. Eq.* 51, 43 *A.*2d 667 (Ch.Div.1945); *see also Bliss v. Bliss, supra,* 126 *N.J. Eq.* at 310, 8 *A.*2d 705; *Restatement (Third) of Trusts* §§ 183, 232; 7 *New Jersey Practice, supra,* at § 970.

Applying these principles here, we hold that the pleadings presented by the remainderpersons were sufficient as a matter of law. Their challenge to the minimal performance of the trust corpus when viewed against the allegations of conflict of interest, lack of diversity, and imbalance in the investment portfolio justifies permitting discovery concerning whether the trustees exercised their "special skills or expertise" to prudently and impartially manage the trust assets for the ultimate remainderpersons. *N.J.S.A.* 3B:20–13. We also hold that the remainderpersons' amended exceptions set forth claims against the trustee with sufficient particularity with respect to its handling of the trust assets during the final accounting period to entitle them to at least pursue discovery. *See In re Garey,* 65 *N.J.Super.* 585, 590, 168 *A.*2d 273 (Union County Ct.1961) (quoting *In re Perrone's Estate,* 5 *N.J.* 514, 525, 76 *A.*2d 518 (1950) ("Whenever the fiduciary relationship exists sound public policy calls for the most searching inquiry into the conduct of the fiduciary and he should not be shielded from such an inquiry by the rules applicable to ordinary actions at law")); *see also In re Estate of Mary Skvir,* 170 *N.J.Super.* 559, 562, 407 *A.*2d 836 (App.Div.1979). Accordingly, we reverse the order dated January 2, 1997 striking the amended exceptions and dismissing the remainderpersons' pleadings with respect to the sixth and final accounting. As earlier noted, Midlantic also may conduct discovery of the remainderpersons with respect to the issues of notice, knowledge, waiver, acquiescence, estoppel and laches.

## V.

We also hold that the foregoing principles governing the duties of a trust fiduciary apply equally with respect to the trustee's

management of the trust during the fourth and fifth intermediate accountings. To the extent that the Chancery Division judge struck the remainderpersons' exceptions to the prior accountings based on the insufficiency of their claims, we conclude that he erred and reverse the order of October 31, 1996 denying their motion for reconsideration.

## VI.

We have carefully reviewed the record and reject as clearly without merit the remainderpersons' contention that the Chancery Division judge is biased against their position and cannot fairly adjudicate the issues in this case. *R.* 2:11–3(e)(1)(E).

## VII.

In view of our holdings, we need not resolve the issues raised with respect to the propriety of the award of attorneys fees for defending against the remainderpersons' exceptions but reverse the orders awarding such fees pending the outcome of the proceedings on remand at which time the Chancery Division judge may again consider the issue. *See In re Broad Street Nat'l Bank,* 37 *N.J.Super.* 171, 174, 117 *A.*2d 129 (App.Div.1955) (stating that award of attorneys' fees to fiduciary is a discretionary determination); *In re Carter's Estate,* 6 *N.J.* 426, 446, 78 *A.*2d 904 (1951) (observing that despite surcharge of fiduciary, counsel fees may be awarded to fiduciary's attorney under certain circumstances; also recognizing that exceptants also may be awarded attorneys' fees from the trust); *see also In re Bayles,* 108 *N.J.Super.* 446, 460, 261 *A.*2d 684 (App.Div.1970).

The orders of June 13, 1996, October 31, 1996, January 2, 1997 and January 22, 1997 are reversed, and the matter is remanded for further proceedings in conformity with this opinion. We do not retain jurisdiction.