Filed 11/7/14  In re John M. CA5

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JOHN M., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C.M.,<br><br>Defendant and Appellant. | F069175<br><br>(Super. Ct. No. 516878)<br><br>**O P I N I O N** |

THE COURT*

APPEAL from orders of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Mara L. Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, and Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Levy, Acting P.J., Cornell, J., and Peña, J.

Appellant C.M. challenges on appeal the juvenile court's order appointing a guardian ad litem for him without a full hearing. He further challenges the sufficiency of the evidence on which the juvenile court established its dependency jurisdiction over his 11-month-old son, John, and ordered John removed from his custody. We affirm.

## PROCEDURAL AND FACTUAL SUMMARY

In November 2013, the Stanislaus County Community Services Agency (agency) received a report that Natasha, appellant's live-in girlfriend, gave birth to John, appellant's only child. Natasha and John were drug tested and the results were negative.

Natasha told the hospital staff that she had four other children who were removed from her care and adopted in the state of Washington after she failed to complete reunification services. She said she was married to Thomas W. but that appellant was John's father.

The hospital staff also reported that appellant (father) and Natasha behaved in a "childlike" manner and that Natasha was receiving social security income (SSI) for "mild retardation." Father stated that he also received SSI because he was "retarded." He said he smoked marijuana in the past for seizures but stopped six months before.

The social worker took then two-day-old John into protective custody and filed a dependency petition alleging in part under Welfare and Institutions Code section 300, subdivision (b)[1] that father and Natasha exhibited "child like" behaviors and reportedly had developmental delays that inhibited their ability to properly and adequately care for John. The petition further alleged under section 300, subdivision (g) that Thomas was incarcerated and failed to provide for John, and under section 300, subdivision (j) that Natasha and Thomas neglected John's half-siblings. The agency placed John in foster care.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

The juvenile court appointed counsel and a guardian ad litem for father and Natasha at the detention hearing. The juvenile court also ordered John detained and ordered father to submit to paternity testing.

In its jurisdictional/dispositional report, the agency recommended the juvenile court adjudge John a dependent and provide father and Natasha reunification services. The agency reported that father and Natasha were cooperative and wanted to reunify with John. Father was engaged in substance abuse services, maintained his sobriety and reported he was no longer using marijuana. Natasha completed a substance abuse assessment and did not require services. They regularly visited John two to three times a week, were both participating in parenting education, and were in the process of completing their clinical assessments.

The agency was concerned, however, because father and Natasha appeared to lack basic parenting skills, including the ability to properly care for an infant. For example, they put their unwashed fingers in John's mouth to see if he was hungry and persisted in using diapers that caused him a skin rash. On one occasion, they propped then seven-week-old John in a straight back, hard chair (like a kitchen chair) and walked away in order to take his picture. When he started to slump over, the foster parent grabbed him to keep him from falling. The agency opined their lack of parenting skills posed a risk of harm to John but that they could benefit from services.

In February 2014, the juvenile court conducted a contested and combined jurisdictional/dispositional hearing. By that time, father's biological paternity had been established. The juvenile court elevated his status to that of presumed father.

Father was the only witness called. He testified he was ready to have John returned to his care that day. He said he had been active in his services and believed he could parent John to the best of his ability. He had no other children but had cared for a roommate's baby for a couple of hours while his roommate went grocery shopping. He

3

knew how to bathe John, feed him appropriately and could distinguish between cries of hunger and cries for a diaper change. He was not sure, however, if he could care for John without Natasha's help. He did not know how to take John's temperature but had seen it done and knew that if John's temperature was over 100 degrees he needed to be seen by a doctor. He did not know what size clothes and diapers John wore, what brand or type of cream and shampoo to use for him and what type of formula he drank. Father said he would call the children's crisis center hotline, his doctor or Natasha if he needed assistance. If father had an emergency, he would call 911 or an ambulance. He felt more confident in other areas, such as giving John love, being there for him, and comforting, feeding, changing, burping, and bathing him.

Father testified that he was illiterate and Natasha served as his payee. However, he had a good memory for prescription dosage and frequency and was able to take his own medication as prescribed. If John was prescribed medication, father said he would have the pharmacist or doctor review the prescription with him.

Father further testified that he took a parenting class before John was born and learned how to nurture a child in positive ways and provide positive reinforcement. He also learned safety measures to protect a child in the home and prepared his home by putting carpet on the floor, child locks on the cabinets and drawers and safety plugs in the electrical outlets. He also made sure all the electrical wiring was placed out of John's reach.

Following argument, the juvenile court sustained the petition after deleting the section 300, subdivision (g) allegations and adding an additional subdivision (b) allegation on its own motion. The new allegation stated: "both of the parents have demonstrated in their interactions with their child an inability to provide for the safety and healthy care of their child." The juvenile court ordered John removed from father and Natasha's custody and ordered reunification services. The court also ordered the

4

agency to investigate any other services that would help father and Natasha learn basic infant care skills. The court also ordered the agency to refer father and Natasha to Valley Mountain Regional Center (VMRC) for an assessment and amended their case plan accordingly. The court set a hearing in early March to review the case plan.

This appeal ensued.[2]

## DISCUSSION

**1.      Guardian Ad Litem**

Father contends the juvenile court violated his due process rights by appointing a guardian ad litem. He argues his rights were violated because (1) the juvenile court did not explain the purpose and role of the guardian ad litem and (2) there was no evidence he was mentally incompetent. We find no due process violation.

"[T]he primary concern in [Welfare and Institutions Code] section 300 cases is whether the parent understands the proceedings and can assist the attorney in protecting the parent's interests in the companionship, custody, control and maintenance of the child." (*In re Sara D*. (2001) 87 Cal.App.4th 661, 667, fn. omitted.) If the juvenile court has reason to believe that the parent is mentally incompetent, the court has the inherent power to appoint a guardian ad litem. (*Ibid*.; *Mabry v. Scott* (1942) 51 Cal.App.2d 245, 256.)

The appointment of a guardian ad litem transfers control over the litigation from the parent to the guardian. (*In re James F*. (2008) 42 Cal.4th 901, 910-911.) "The guardian ad litem has broad powers: 'the power to control the lawsuit, including controlling procedural steps necessary to the conduct of the litigation … and controlling trial tactics.' [Citation.] Because 'the decisions made can affect the outcome of the dependency proceeding, with a corresponding effect on the parent … the parent has a

---

**2**      Natasha did not appeal.

5

direct and substantial interest in whether a guardian ad litem is appointed.'  [Citation.]"
(*In re Jessica G.* (2001) 93 Cal.App.4th 1180, 1187.)

"Before appointing a guardian ad litem for a parent in a dependency proceeding, the juvenile court must hold an informal hearing at which the parent has an opportunity to be heard.  [Citation.]  The court or counsel should explain to the parent the purpose of the guardian ad litem and the grounds for believing that the parent is mentally incompetent.  [Citation.]  If the parent consents to the appointment, the parent's due process rights are satisfied.  [Citation.]  A parent who does not consent must be given an opportunity to persuade the court that appointment of a guardian ad litem is not required, and the juvenile court should make an inquiry sufficient to satisfy itself that the parent is, or is not, competent.  [Citation.]  If the court appoints a guardian ad litem without the parent's consent, the record must contain substantial evidence of the parent's incompetence.  [Citation.]"  (*In re James F.*, *supra*, 42 Cal.4th at pp. 910-911.)

Here, father consented to the appointment of the guardian ad litem as evidenced by the following exchange he had with the court:

> "THE COURT:  There was some discussion as to whether [father] needed a guardian ad litem.
>
> "[FATHER'S COUNSEL]:  Yes, Your Honor.  I know that [father] is on SSI for some developmental disabilities.  I am able to communicate with him today.  I think this is confusing for any parent who comes in, so I didn't necessarily think that he found it any more or less … confusing than your average parent.  [¶]  So I think … it's something that  … needs to be further assessed, but the Court is certainly free to inquire of him.
>
> "THE COURT:  [Father], I appointed [a guardian ad litem on behalf of Natasha].  That is not an attorney, but somebody to assist the parent in explaining the procedures.  And a guardian ad litem is appointed only where a parent has difficulty with understanding not just legal stuff, because legal stuff gets complicated for everybody, but understanding the process and being able to help explain and help participate in the proceedings.  [¶]  Do you feel that you need somebody other than your attorney to assist you in these matters, sir?

6

"THE FATHER: Yes, Your Honor.

"THE COURT: All right. [D]o you want the Court to appoint a guardian ad litem?

"THE FATHER: Yes, Your Honor."

Father contends the juvenile court's explanation was misleading and inadequate because the court did not explain that a guardian ad litem is appointed for an "'incompetent' parent," did not state its basis for determining he was incompetent or explain that the role of the guardian ad litem is to take over the management and control of the litigation from the parent. Father speculates he may have objected to the appointment had he been so informed.

We are unaware of any case authority, and father does not cite any, that a juvenile court can *only* appoint a guardian ad litem if it finds the parent is mentally incompetent. In this case, the juvenile court did not find father was incompetent. It appears it appointed a guardian ad litem to make sure he understood the proceedings. Therefore, it did not have to explain to father that it found him incompetent and its reasoning for doing so.

As to whether the juvenile court sufficiently explained the role and power of the guardian ad litem, we concur the juvenile court did not explain to father what he was giving up. Nevertheless, we conclude any error if committed was harmless beyond a reasonable doubt. (*In re James F.*, *supra*, 42 Cal.4th at pp. 918-919.) The juvenile court appointed the guardian ad litem not to act on father's behalf or to withdraw his power to control the litigation but to communicate with him and assist his understanding of the dependency proceeding. The court appointed the guardian to protect and preserve father's due process rights not to infringe upon them. Indeed, the record is clear that father's counsel advocated for him and that the guardian did not infringe on his rights. Father retained the right to be consulted, engage in dialogue with the court and testify. Therefore, father was not prejudiced by the appointment of a guardian ad litem.

7

Father further argues the appointment of a guardian ad litem is inherently prejudicial because the juvenile court's view of him as incompetent influenced its findings and orders at the jurisdictional and dispositional hearing. As we stated above, there is no evidence the juvenile court believed father was incompetent. In fact, the evidence appears to be otherwise. In making its rulings, the juvenile court commented that father "gave some very intelligent answers" during his testimony.

We find no error in the juvenile court's appointment of a guardian ad litem for father.

## 2. Jurisdictional Findings

Father contends substantial evidence does not support the allegations sustained by the juvenile court under section 300, subdivisions (b) and (j). He also contends the juvenile court violated his due process rights to notice and to confront and cross-examine witnesses by adding the additional subdivision (b) allegation. We address father's due process argument first.

"[T]he ability to amend according to proof plays an important role in the overall dependency scheme. If a variance between pleading and proof … is so wide that it would, in effect, violate due process to allow the amendment, the court should, of course, refuse any such amendment. [¶] The basic rule from civil law, however, is that amendments to conform to proof are favored, and should not be denied unless the pleading as drafted prior to the proposed amendment would have misled the adversarial party to its prejudice." (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1041-1042, fn. omitted.)

Here, it cannot be said that the juvenile court's amendment varied so widely from the original petition that it violated father's right to due process. The original petition alleged that father and Natasha exhibited "child like" behaviors and reported developmental delay and other psychological problems that inhibited their ability to

8

properly and adequately parent John. In addition, the agency provided the juvenile court specific examples in which father and Natasha's "child like" behavior placed John at risk of harm.

Thus, going into the jurisdictional hearing, father and Natasha were on notice by virtue of the petition and the agency's report that they would have to defend against allegations their behavior exhibited an inability to safely parent John. Therefore, the juvenile court's amendment of the petition to conform to the evidence did not violate father's due process rights.

Further, substantial evidence supports the amended allegation. Jurisdiction is appropriate under section 300, subdivision (b) where there is substantial evidence "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child ... or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." The juvenile court need not wait until the child is actually harmed to assume jurisdiction and take steps to protect the child, and it may consider past events to determine whether the child presently needs the court's protection. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.)

In this case, father had never cared for a baby and there were many important aspects of infant care with which he was not familiar. He did not know for example how to clothe John or what to feed him and he could not read prescription labels. In fact, he readily admitted that he did not believe he could care for John without Natasha's help. Under the circumstances, there are many potential mistakes father could make in caring for John that could cause John serious injury or even death. Therefore, the juvenile court properly sustained its amended allegation.

9

Having concluded the juvenile court properly sustained the amended allegation, we need not review father's challenge to the other section 300, subdivisions (b) and (j) allegations. "'[I]f any one of the statutory bases for jurisdiction … enumerated in the petition is supported by substantial evidence …, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re Drake M*. (2012) 211 Cal.App.4th 754, 762.)

We conclude substantial evidence supports the juvenile court's jurisdictional finding under section 300, subdivision (b).

**3.      Dispositional Order**

Father contends substantial evidence does not support the juvenile court's order removing John from his custody because there was insufficient evidence that John would be exposed to a substantial risk of danger in his care and that there were no reasonable alternatives to removal.

"At the dispositional hearing, ... there is a statutory presumption that the child will be returned to parental custody." (*In re Marilyn H*. (1993) 5 Cal.4th 295, 308.)  In order to remove a child from parental custody, the juvenile court must find by clear and convincing evidence that removal is the only way to protect the physical or emotional well-being of the child.  (§ 361, subd. (c)(1).)  The juvenile court must also determine if the agency made reasonable efforts to prevent or eliminate the need for the child's removal.  (§ 361, subd. (d).)

Section 361, subdivision (c)(1), the governing statute, provides in relevant part:

> "A dependent child may not be taken from the physical custody of his or her parents ... with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence ...: [¶] … [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's ... physical custody."

10

"'A removal order is proper if it is based on proof of parental inability to provide proper care for the minor and proof of a potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]' [Citations.] The juvenile court's findings must be based on clear and convincing evidence. [Citations.] We review an order removing a child from parental custody for substantial evidence in a light most favorable to the juvenile court findings. [Citations.]" (*In re Miguel C*. (2011) 198 Cal.App.4th 965, 969.)

Father contends the agency presented no evidence he posed a danger to John other than its observations that he lacked basic parenting skills. The agency did not, for example, offer any specific evidence about his and Natasha's disabilities or test their knowledge about infant care. Further, he contends, his testimony favored a finding there was no danger. He cites for example, his testimony that he actively participated in services and planned to implement safety measures at home, and his explanation as to how he would care for John and respond in an emergency situation.

The juvenile court concluded from the evidence, including father's testimony, that father and Natasha's cognitive delays impacted their ability to make proper decisions for John at that time. The court stated it did "not feel that it should wait until a child is injured before it intervenes." The juvenile court also stated that it was struck by father's admission that he could not parent John on his own at that particular time. Further, the juvenile court did not foreclose the possibility that father and Natasha could reunify with John despite any cognitive delay they may exhibit. Rather, the court stated, "I believe that the parents can certainly be successful in [reunifying] with their son with more services given to them."

11

Under the circumstances, we conclude substantial evidence supports the juvenile court's finding that placing John in father's custody would expose John to a substantial risk of danger.

We further conclude the agency's efforts to prevent removal were reasonable. In its report, the agency cited the services it provided father as its reasonable efforts. In addition, at the hearing, the social worker informed the juvenile court that she inquired and ascertained that there were parenting services tailored to father and Natasha's needs. She also stated that she attempted twice to contact VMRC to see what services were available for the parents there but her telephone calls were not returned.

Father's primary complaint with respect to the agency's efforts is that he was not immediately referred to VMRC. However, he fails to show that VMRC offered services suitable for his parenting needs, that the agency could have arranged those services for him sooner, and that the services would have prepared him to take custody of John before or at the time of the dispositional hearing.

We conclude substantial evidence supports the juvenile court's order removing John from father's custody and find no error on this record.

## DISPOSITION

We affirm the orders.

12